UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-22891-ARTAU/Reid

SANDRA SAFONT f/k/a SANDRA S. MARIN, THOMAS BARBATO and YVONNE BARBATO, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

STATE FARM FLORIDA INSURANCE COMPANY,

Defendant.

_________________________________/

2100 Ponce de Leon Blvd.
Coral Gables, Florida
November 13, 2025
Thursday, 8:52 a.m.

V I D E O T A P E D
D E P O S I T I O N
of
THOMAS BARBATO
Taken on behalf of the Defendant
pursuant to a Notice of Taking Deposition

- - -

APPEARANCES:
LEVINE KELLOGG LEHMAN SCHNEIDER & GROSSMAN, by
JASON KENNETH KELLOGG, ESQ., of counsel
100 Southeast Second Street, 36th Floor
Miami, Florida 33131
jk@lklsg.com
Attorneys for Plaintiffs.
AKERMAN, LLP, by
SCOTT E. ALLBRIGHT, JR., ESQ., of counsel
98 Southeast Seventh Street
Miami, Florida 33131
scott.allbright@akerman.com
Attorneys for Defendant.

Also Present:
Yvonne Barbato
Alex Montalvo, Videographer

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Thomas Barbato | | | | |
| (By Mr. Allbright) | 4 | | | |
| (By Mr. Kellogg) | | 130 | | |

EXHIBITS

| DEFENDANT'S | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 1 | Floor Plan, Barbato home | 21 |
| Exhibit 2 | Report of Findings, Pronet Group, Inc. | 54 |
| Exhibit 3 | E-mail, Barbato to State Farm, 11-7-18 | 62 |
| Exhibit 4 | Complaint | 71 |
| Exhibit 5 | Amended Complaint | 71 |



EXHIBITS (Continued)

| DEFENDANT'S | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 6 | Appraisal Award & Estimate of Umpire Professional Service | 79 |
| Exhibit 7 | Check to Barbato from Chase, $125,456.02 | 83 |
| Exhibit 8 | Letter of 10-20-22, M. Knecht to K. Rothell w/ attachments | 84 |
| Exhibit 9 | Plaintiff's Notice of Voluntary Dismissal | 86 |
| Exhibit 10 | USA Damage Response Team document | 98 |
| Exhibit 11 | Re: Legal Representation, 10-21-22 | 111 |
| Exhibit 12 | Knecht Law Group Contingency Fee Agreement | 115 |
| Exhibit 13 | Correspondence, Knecht Law to Barbato 4-14-20 | 117 |
| Exhibit 14 | Crabtree & Auslander Representation Agreement | 118 |
| Exhibit 15 | Complaint & Demand for Jury Trial | 123 |
| Exhibit 16 | Amended Complaint & Demand for Jury Trial | 125 |
| Exhibit 17 | Second Amended Complaint & Demand for Jury Trial | 128 |
| Exhibit 18 | Third Amended Complaint & Demand for Jury Trial | 129 |



THE VIDEOGRAPHER: Good morning. We are now on the video-record. This is the video deposition of Thomas Barbato in the matter of Sandra Safont, et al. versus State Farm Florida Insurance Company. Today's date is November 13th of 2025 and the time is 8:52 a.m.

At this time counsel please state your appearance for the record and after this the court reporter is going to swear the witness.

MR. ALLBRIGHT: Scott Allbright on behalf of the Defendant, State Farm Florida.

MR. KELLOGG: And Jason Kellogg on behalf of Plaintiffs Thomas and Yvonne Barbato.

Thereupon:

THOMAS Barbato

was called as a witness and, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ALLBRIGHT:

Q. Good morning, sir. How are you?
A. Good morning.
Good, thank you.
Q. I just want to make sure that I'm not in the camera. My name is Scott Allbright, as you heard. I am with Akerman. I represent State Farm in



this lawsuit and we are here today to take your deposition.
Would you state your full name for the record, please.
A. Thomas Barbato.
Q. Any middle name?
A. Louis, I'm sorry, L-o-u-i-s.
Q. Sir, have you ever been deposed before?
A. Yes, sir.
Q. How many times?
A. A few.
Q. In what context?
A. I was represented -- I worked at a bank at one point and I represented the bank in a suit. I don't even know -- I couldn't even tell you what it was about it was so long ago and I had one as an expert, I guess like an expert witness, you could say, in real estate for a rental report that I did on the cost of rental property.
Q. And it has been a few years on that?
A. Yes.
Q. Have you ever testified in court?
A. No.
Q. Had an examination under oath?
A. What do you mean by that?

Page 6

Q. You didn't.
A. Okay.
Q. If you did you would know. It's another deposition-like thing where people ask you questions under oath.
So I'm just going to go through some of the basics when it comes to that. Have you ever been on a jury?
A. No.
Q. Have you ever been to court?
A. No.
Q. Have you ever been arrested?
A. No.
Q. Have you ever been convicted of a felony?
A. No.
Q. Don't worry, I ask everybody those questions.
A. No, that's fine. That's fine.
Q. Other than this case have you ever been involved in a lawsuit?
A. No, sir.
Q. Have you ever been a class representative before?
A. No, sir.
Q. You're doing well so far. The way the depo

Page 7

works, I ask you questions, you answer the questions. We have a court reporter. We have a videographer.
Even though we can all see if you nod or roll your eyes at me, that's not going to come down in the paper record, which is what we will usually rely on.
A. Okay.
Q. So your responses need to be verbal. So a head nod accompanied by a "yes" is fine. If you're just nodding your head Jason might or I might say -- do this to you just to coach a verbal response.
A. I understand.
Q. He may object to some of my questions, but unless he instructs you not to answer you're required to answer my questions.
A. Okay.
Q. If you answer a question I am going to assume you understood it. Is that fair?
A. Yes.
Q. If you do not understand one of my questions, please let me know. I am not offended. I want you to be answering something that you understand.
A. Sure.

Page 8

Q. Just ask me to rephrase, say "come again," we'll figure it out.
A. Right.
Q. Please wait until I have completed my questions before you respond. Even if you think you know where I'm going you might not. You might be right, you might not. I will try to do the same with you, to let you finish your answers.
A. Okay.
Q. If you need to have a question repeated, let me know, that's fine. If you need a break, same thing. The only rule is that you cannot take a break if there is a question pending.
A. Sure.
Q. Otherwise, I try to be accommodating.
A. Okay.
Q. You understood all that so far?
A. Yes, sir.
Q. Is that fair?
A. Yes.
MR. ALLBRIGHT: Jason, I assume he probably will read, so we can get that out of the way?
MR. KELLOGG: Right.
Q. (By Mr. Allbright) Just a few things to get out of the way now. State Farm does reserve the

Page 9

right to seek to recall you if circumstances warrant. I don't know that they will, but that is a standard thing. He would probably object to that, but we'll cross that bridge if we need to.
MR. KELLOGG: I reserve the right to object.
Q. (By Mr. Allbright) This case is subject to a protective order. There are, I believe, ten days for designation of anything confidential that your attorney can deal with for that.
You all produced 162 pages Bates labeled Barbato 1 through 162 and then 178 pages Barbato_Knecht, 1 through 178.
MR. ALLBRIGHT: I don't need to go through all of those. Will you guys stipulate that's all?
MR. KELLOGG: That's the complete production and I believe the Barbato_Knecht one was pursuant to the judge's instruction, magistrate judge's instruction, to produce that file.
MR. ALLBRIGHT: Right, but anything that was in there I don't need to deal with authenticity-wise?
MR. KELLOGG: I can only represent to you that it was produced by the Barbatos. It was in the possession of the Barbatos or their lawyers.

Page 10

Q. (By Mr. Kellogg) Sir, have you ever been known by any other names?
A. Just Tom.
Q. Like no name changes?
A. No, sir.
Q. Date of birth?
A. May 26, 1967.
Q. And where were you born?
A. Miami, Florida.
Q. And you grew up --
A. Yes, sir.
Q. -- in Miami?
A. Yes. Sorry.
Q. Yes, most people that are here and were born here grew up here, but, you know.
A. Right.
Q. Are you married, sir?
A. Yes.
Q. To whom?
A. Yvonne, Y-v-o-n-n-e, Barbato.
Q. Since when?
A. April 15, 1989.
Q. Good job. We'll tell her you said that.
MR. KELLOGG: You better pass that test.
Q. (By Mr. Allbright) Any other marriages?

Page 11

A. No.
Q. Any children?
A. Two.
Q. I have two myself.
Boy, girl?
A. I have a daughter and a son.
Q. Current home address?
A. 8025 Southwest 142nd Terrace, and that's Palmetto Bay, Florida, 33158.
Q. And how long have you lived there?
A. 23, 24 years.
Q. Do you own it or rent it?
A. Own it.
Q. Sir, are you on any medication or supplements or anything that might affect your ability to testify here today?
A. No, sir.
Q. Any health conditions that otherwise might affect your ability to testify?
A. No, sir.
Q. Are you employed?
A. Yes. Well, yes, I'm a realtor, so I'm an independent contractor.
Q. That's not unemployed.
A. Well, it's self-employed, I call it.

Page 12

Q. Can you just give me a brief run-through of your employment history in the last 10, 15 years?
A. I have been a state-licensed real estate agent for the last 15 years.
Q. And you said you are self-employed?
A. Yes. They pay me on a 1099, so I have an independent contractor's agreement with the brokerage I work for.
Q. Which is?
A. Berkshire Hathaway HomeServices EWM Realty. It's a long one.
Q. It is a long one. That's why I wrote it down for my own notes.
A. Sure.
Q. Do you have a business address or you work from home?
A. I have a business address, but I work from home.
Q. Are you a member of any professional associations?
A. National Association of Realtors.
Q. I thought that is what the answer would be because I hear that all the time.
That would be as long as you have been a realtor?

Page 13

A. Correct.
Q. So you have a realtor's license?
A. Yes.
Q. Any other professional licenses?
A. No, sir.
Q. You have had that since 2010?
A. Yes, roughly, at least 2010 that I got it.
Q. Do you have an e-mail address?
A. Yes. It's tlbarbato@aol.com.
Q. Any others?
A. tombarbato@hotmail.com. Oh, and then my work is barbato.t@ewm.com.
Q. Any others that you have used in the last -- since 2018?
A. No.
Q. Any social media accounts?
A. I have Facebook and Instagram.
Q. Any you have had since 2018, but don't have anymore?
A. No. Since 2018? No, I got rid of my Twitter way before that.
Q. Back when it was Twitter?
A. Right.
Q. Have you ever posted anything under your Facebook or Instagram about your claim or this

Page 14

lawsuit?
A. No.
Q. Aside from your lawyers and your wife, have you spoken to anyone about the lawsuit?
A. No.
Q. Can you briefly give me your highest level of education and any continuing education that you've done, maybe, as a realtor?
A. I have some college, a few credits. Every two years we have to do 14 years of continuing education for ---
THE STENOGRAPHER: I'm sorry, you have to do how much?
A. I'm sorry, 14 hours.
THE WITNESS: Did I say 14 years?
THE STENOGRAPHER: Yes.
A. Every two years is 14 hours.
Sorry about that.
Q. (By Mr. Allbright) That's okay. I'm sure they wouldn't mind if you did 14 years of continuing credit, but you wouldn't be doing much else.
A. I wouldn't be doing any work.
Q. So the highest degree would be a high school diploma?
A. Yes.

Page 15

Q. That is Christopher Columbus?
A. Yes, sir.
Q. How did you prepare for the deposition today?
A. I just spoke with Jason maybe an hour and-a-half, two hours, and that's it.
Q. Was anyone else with you?
A. My wife.
Q. So just the three of you?
A. Yes.
Q. When was that?
A. Last night we talked for like 20, 30, minutes, maybe, and then last week we met for maybe an hour, an hour and 15 minutes.
Q. The same three of you each time?
A. Yes.
Q. Calls both times?
A. We met one time and last night was a Zoom.
Q. Did you review any documents to prepare?
A. Just this ---
MR. KELLOGG: It's a yes or no question, did you review documents.
A. Yes.
Q. (By Mr. Allbright) What did you review?
A. The Complaint, the Third Amended Complaint

Page 16

and Demand.
Q. I see it in front of you. Is that the only document you have with you?
A. Yes.
Q. Perfect. Did you bring with you any other documents relating to the case?
A. No, sir.
Q. Sir, what is this lawsuit about?
A. Just the interest owed on the settlement that we had with the State Farm claim.
Q. What is the current status of the lawsuit?
A. This one or the previous one?
Q. This lawsuit.
A. We are doing a deposition today. I know that it was previously dismissed and then went through appeals and here we are.
Q. Do you know whether it is currently a class action?
A. Yes.
Q. Is it?
A. Yes.
Q. What is a class action?
A. It's everyone -- from what I understand everyone that's involved had a claim through State Farm where they were owed interest based on the

Page 17

policy and wasn't paid their interest.
Q. Who is your current homeowner's carrier?
A. I have State Farm for my homeowner's.
Q. Any separate windstorm?
A. Windstorm through Citizens and flood.
Q. And that's through the national flood people?
A. Yes, FEMA or whomever. It's FEMA, I believe. I think it's FEMA, yes.
MR. KELLOGG: That's what mine is.
A. Yes, yes.
Q. (By Mr. Allbright) Is it actually issued by FEMA?
A. I don't know. That's who I get the notices from.
Q. It's okay, we don't need that level of detail.
MR. KELLOGG: If you don't have it, Scott, you need to get it. That is my advice for today.
Q. (By Mr. Allbright) I'm in Zone X, but was not feeling super great when Irma came. I will tell you that much.
Is it the same State Farm policy that you have had since at least 2018?
A. Yes.

Page 18

Q. Other than the claim from May of 2018 that is referenced in the Complaint, have you had any subsequent claims?
A. Since then?
Q. Since then.
A. No.
Q. What about before?
A. On this home there was a couple of -- I think it was two insurance claims from hurricanes and that's it. I had it on -- from Hurricane Andrew, I had a claim back then.
Q. You weren't even in this house in Andrew, so I'm not worried about Andrew claim.
You had an Irma claim, I guess?
A. I think so, yes.
Q. The one before that, are you thinking like back to Wilma?
A. Maybe Irma. I don't know. I don't want to say because I'm not positive.
Q. So three claims at the current house?
A. Correct.
Q. Were those all State Farm or were those with different insurers?
A. They were hurricane-related, but I had State Farm, so I'm sure some were windstorm, some

Page 19

were State Farm.
Q. The wind with Citizens, you have had that for a while too?
A. Yes. When did it switch over to Citizens, I don't know.
Q. In 2018 was it that structure, State Farm and Citizens?
A. I believe so, yes.
Q. At least back then?
A. Yes.
Q. Fair enough. I understand we're in November of 2025, so I understand.
At least with the Irma claim that would have been September of 2017. Right?
A. I don't know.
Q. Assuming I am right, and I've dealt with a lot of Irma claims in my line of work, so assuming I am right that is when Irma was, what was damaged for you in the Irma claim?
A. That was 2017. I believe if my memory serves me correctly the fence was down, the roof was damaged. We had some water damage to the kitchen cabinets. Off the top of my head that's it.
Q. And that claim, the Irma claim, was resolved?

Page 20

A. Yes.
Q. Would that have been with Citizens or State Farm?
A. I believe, if I'm not mistaken, it was both. It was windstorm for the wind damage and then the interior.
Q. So no litigation relating to the Irma claim?
A. No.
Q. I'm just going to refer to it as your house. It's probably easier than reading off the numbers each time.
A. Okay.
Q. You don't own any other houses currently. Right?
A. No.
Q. You haven't owned any other houses in that period of time?
A. My wife and I are titled on both my daughter's house and my son's house, but we don't own it, they bought it themselves. To say do we own it, we're on the title.
Q. For our purposes today if I say "your house" --
A. That's my house, right.

Page 21

Q. -- we're referring to the 8205 ---
A. Yes, those are their houses.
Q. Is that house homestead?
A. Yes.
Q. Since you purchased it?
A. Yes.
Q. Single family?
A. Yes.
Q. One story?
A. Yes.
Q. Do you know the square footage?
A. No. I mean under AC is about 2,800, 2,900 square feet, somewhere around there.
Q. Spoken like a true realtor.
A. Do you want the value?
Q. Just for reference purposes I have a floor plan that was done up. It is Barbato_Knecht 136 just because we want to reference some things, not because I like the pictures.
MR. KELLOGG: Do you want to mark this one?
MR. ALLBRIGHT: Yes. This is going to be Exhibit 1.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 1.)

(Counsel speaking to each other while exhibit being marked.)
Q. (By Mr. Allbright) Sir, looking at Exhibit 1, do you recognize the document?
A. Yes.
Q. In terms of the floor plan, is that an accurate, more or less, description of your house?
A. Yes.
Q. Three bedrooms, an office ---
A. Four bedrooms.
Q. The thing that is an office --
A. It's a bedroom, but my desk is in there.
Q. And then otherwise that looks correct to you in terms of the flow and the layout?
A. Yes.
Q. When you bought the house did you have an inspection done?
A. Yes.
Q. Do you still have the inspection?
A. No.
Q. Is there a mortgage on the house?
A. Yes.
Q. With?
A. Chase, JP Morgan Chase.
Q. That one is active since when?



A. I don't know. I don't know. I refinanced a couple of times, so I don't know.
Q. With the refinancing were there any appraisals done?
A. I would assume so. It was a long time ago.
Q. So you didn't refinance when the rates were 2.5?
A. No. I refinanced 15, 13 years ago, something like that.
Q. I am holding on to a three and-a-half interest rate right now.
MR. KELLOGG: Don't let it go.
Q. (By Mr. Allbright) Any home equity loans or HELOCs?
A. Yes.
Q. When?
A. That was probably about ten years ago, 12 years ago. I haven't touched it.
Q. So it is a line of credit?
A. Yes.
Q. Is that with Chase too?
A. No, that is with TD Bank.
Q. Current owners of the house, you and your wife?
A. Yes.



Q. No one else on the title?
A. No.
Q. It has been that way since you bought it?
A. Correct.
Q. Who lives in the house?
A. Myself and my wife.
Q. And you mentioned earlier having two children who I am guessing are moved out?
A. Correct.
Q. When did the children move out?
A. When they graduated high school. My daughter graduated in 2011 and my son graduated in 2014.
Q. So since 2014 it has been just the two of you?
A. Yes.
Q. And maybe a dog?
A. Two dogs. My kids when they were in college would come back and stay holidays, but not in the summer. They didn't want to be with us in the summer.
Q. Kids will be kids.
Anyone else since your son or daughter moved out that has stayed with you in the house for an extended period?



A. No.
Q. You never rented the house out and lived somewhere else?
A. No.
Q. Are there any businesses operated out of the house?
A. Other than my real estate, no.
Well, my wife works from home probably 90 percent of the time, but she works -- I don't know if you consider that a business.
Q. If I'm not mistaken she's a nurse, correct, so she sees virtual patients?
A. Yes.
Q. You don't make anything for sale in the house?
A. No.
Q. I see there's a very big garage.
A. I don't even put stuff on Facebook Marketplace. That's why we have a big garage.
Q. What kind of foundation is the house?
A. Concrete.
Q. It's like a slab?
A. Yes.
Q. Any crawl space?
A. None that I'm aware of, no.

Page 26

Q. You're a realtor, so those are things you probably ---
A. I sit on a coral rock ridge, so if there's a crawl space there it's not there.
Q. At any point since buying the house have you attempted to list it for sale or rent?
A. No.
Q. I know this goes back a while, do you know when you first became insured with State Farm?
A. On this home?
Q. Yes.
A. When I bought it.
Q. Was that continuous?
A. Yes.
Q. Why did you pick State Farm back then?
A. I had them on my previous home.
Q. Other than the State Farm policy and the Citizens windstorm, any other insurance that has been on the house?
A. Just the flood insurance.
Q. Sorry, yes. Even as I said the question I was saying wait, there was one other.
The insurance you handled through an agent?
A. Correct.
Q. Who is that?

Page 27

A. Nick Waddell. He just retired and I don't know who my new agent is, to be honest with you off the top of my head.
Q. Waddell is W-a-d-d-e-l-l?
A. Correct.
Q. Did you speak with Mr. Waddell or anyone in his office regarding the claim or the lawsuit?
A. No.
Q. As part of the claim process did you request any documents from them like a copy of the policy or the declarations page or anything?
A. Not from his office, no.
Q. We are doing good so far. I wanted to do the 8:30 because I would rather start early than finish late.
A. Me too.
Q. If we finish early, great.
Sir, immediately prior to the claim --- Strike that.
When I say "the house," when I say "the claim" or "the loss," I am referring to the May 31, 2018 claim.
A. Okay.
Q. Fair?
A. Yes.

Page 28

Q. You wouldn't be expecting me to be referring to any other claim. Right?
A. Correct.
Q. Immediately prior to that loss how would you describe the condition of the house?
A. Fine.
Q. Prior to May of 2018 had you had any major repairs or renovations to the house?
A. Prior to 2018?
Q. Yes, prior to the claim.
A. Yes. When we bought the house we completely redid the house. When I say redid it, we closed the patio, enclosed the tool room, made it part of living space and new floors in the kitchens, bathrooms, two of the three bathrooms.
Q. One kitchen?
A. Yes.
Q. I wrote down two. I'm not sure if you said two. And two of the three bathrooms?
A. Two of the three, yes.
Q. So pretty much a full ---
A. Correct. And we added a pool.
Q. And your kids still don't want to come for the summer?
Did you need to do anything for the roof as

Page 29

a result of the Irma claim?
A. Which one was that, what year?
Q. That was 2017.
A. I think that is when we put the new roof on.
Q. And I think you mentioned that there was some --- The fence --- And there was some issue with the kitchen cabinets from Irma?
A. Yes.
Q. What was that?
A. One of the pantries got wet.
Q. One of the cabinets?
A. Down at the bottom.
Q. Was that repaired?
A. No. We sprayed it with some mildew killer and that was it.
Q. So I guess in the scheme of things the house was in -- from when you moved in until May of 2018, the floors -- once you completed the gut it was everything as it was until 2018?
A. Correct.
Q. At least?
A. Correct.
Q. Sir, I want to talk about the claim itself now. Can you describe it for me, just what happened

in your own words.
A. We had a backup in the bathtub that filled the bathroom full of water. It came out to the hallway, went into two of the bathrooms and two of the closets.
Q. Looking at Exhibit 1, which I think there are two bathtubs or three bathtubs? Can you tell me which are ---
A. Where it says "Guest Bath," that bathtub is what overflowed. We were having dinner and no one was in there.
Q. The one towards --- Okay. So there's family room, hallway and then guest bath.
A. Correct. We were having dinner. It filled up with water and overflowed into the bathroom, into the hallway and then into those two bedrooms and those two closets.
Q. That is the master ---
A. No, it went into where it says Bedroom 2 the office and it went into -- there's two bedrooms.
I'm sorry, there are two closets in Bedroom 2. It went into both of those closets and into the closet where it says "Office Closet."
Q. Was there any water that backed up into any of the other bathtubs?



A. At that time, no.
Q. By your answer I'm guessing there was another time?
A. We have your typical backups where we had it snaked, but that was before the claim. Then it backed up once after the claim.
Q. So you had to snake it at some point before the claim?
A. Correct.
Q. When?
A. I don't recall.
Q. At that time where had it backed up?
A. In that bathroom, the same bathtub.
Q. The guest?
A. Yes.
Q. I am going to refer to the names based on this document even if you call them something different.
A. Sure, okay.
Q. So the guest bathtub had been snaked before at some point?
A. Yes.
Q. Do you recall who did it, who you called?
A. It was either Bob's Plumbing or Bay Plumbing.



Q. I've heard of Bay. Bay is the one with the red trucks. Right?
A. Correct.
Q. So they snaked through the guest bathtub?
A. Correct.
Q. You said there was also a backup subsequent to the claim?
A. Yes.
Q. When?
A. I don't recall exactly. We had a backup in that guest bathroom and then there's a laundry sink in the garage that's not on this graph -- on this diagram, I should say -- that had a backup in it.
Q. Would that be on the wall that is adjoining the master bath?
A. No. It's on the door leading in from the garage into the house.
Q. So it's over by where the laundry room is?
A. I'm sorry, can I show on this? I don't know how she would put this down.
MR. KELLOGG: Do you want him to draw it on there, on the exhibit?
MR. ALLBRIGHT: If he can just hold it up so the camera can see it.
THE WITNESS: It would be right about here.



MR. ALLBRIGHT: Let me know if you got it.
THE VIDEOGRAPHER: I got it.
Q. (By Mr. Allbright) So where you go from the kitchen into the garage?
A. Correct.
Q. And that was after the loss?
A. Yes.
Q. And you had that snaked too?
A. Yes.
Q. And who did that?
A. Either Bob's or Bay Plumbing.
Q. Do you think one did one, one did the other?
A. I called them both and whoever could come out sooner is who I would use. I don't recall exactly who did what at that time.
Q. And how long after the May backup was that?
A. I don't recall.
Q. Are we talking on the order of months, years?
A. If I had to guess I would say between a year, a year and-a-half, roughly. That's a total guess.
Q. Before COVID?
A. Oh, yes.

Page 34

Q. That's a good marker. That's my marker now, if something happened before COVID.
MR. KELLOGG: People know.
Q. (By Mr. Allbright) Just to briefly recap, so it went guest bath, through the bathroom there, hallway, office, office closet, Bedroom 2 and both closets in Bedroom 2?
A. Correct.
Q. It didn't make it to what is labeled as the family room?
A. It was coming -- that's when we saw it. When it was coming into the family room is when we saw it, but it never made it into the family room.
Q. And master bedroom?
A. No.
Q. So if you can just take us -- you don't need to hold it up for this, the dining room, that is where the dining table was where you were having dinner?
A. We were actually eating at the bar in the kitchen.
Q. The bar in the kitchen.
A. Right next to where it says -- right above where it says "Family Room" there's a countertop that sticks out like an island, almost.

Page 35

Q. Okay. That looks like it says 5'4" by 3'2" and I know it's very small print, but I think we're talking about the same thing.
A. Yes, I'm blind as a bat. That's why I have the glasses on.
Q. It's right above the ---
A. Yes.
Q. I see it jut out. It's right there.
A. Uh-huh.
Q. And I don't see any other jut-outs.
A. Yes.
Q. And at that point who was the "we" having dinner?
A. My wife and I. I think my son was there too.
Q. So that was, I'm just thinking of your timeline of whether your son would have been there, that would have been -- May 31, 2018, was a Thursday after Memorial Day.
A. He may have been there because I think --- Yes, he may have been there.
Q. Your daughter?
A. No.
Q. And who was it that noticed the water first?

Page 36

A. I don't recall, either me or my wife.
Q. Definitely not your son even if he was there?
A. I don't recall. It's a long time ago.
Q. So you said dinner. So this was roughly like 7:00 in the evening type of thing?
A. Yes.
Q. Unless you have early dinners or very late dinners?
A. It was probably around 7:00.
Q. Had you guys been in the house for a while prior to that during the day?
A. I don't recall, but most likely.
Q. Was any, like, washing machine or dishwasher running at the time?
A. I don't know. I don't remember.
Q. Nothing that struck you in the immediate of, oh, I've got to shut off something?
A. No, no.
Q. Probably no one taking a shower?
A. No.
Q. And the water that you saw, was it -- I guess for lack of a better term -- dirty-looking water or clean or how would you describe the water?
A. Dirty in the bathtub. It was definitely

Page 37

dirty.
Q. Brown?
A. Yes.
Q. Did you take any pictures or videos at that point?
A. Yes.
Q. What pictures or videos did you take?
A. Just of the water on the ground.
Q. Any of the water in the tub?
A. I don't remember. I think I did.
Q. How did you -- did you use your cellphone to take those? It's 2018. I think most of us had phone cameras.
A. Yes, I think it was. I had a digital camera that I used to use for real estate, but I don't think it was that. I think it might have been an old phone.
Q. Do you have access to those photos?
A. I don't know. I would have to look. I don't recall if I have them or not. I've been through a lot of phones since then.
Q. What kind of phone was it?
A. I don't know.
Q. iPhone or Android?
A. It could have been.

Page 38

Q. What do you have now?
A. Now I have an iPhone.
Q. Now you have an iPhone?
A. Yes.
Q. You've switched?
A. Multiple times.
Q. You're not a diehard one way ---
A. No, no.
Q. If I asked my wife I know my wife would say ---
A. I'm not into phones, my wife is not into phones, so...
Q. You go with the better deal?
A. Right, until it dies.
Q. So tell me, you noticed the water. What was your first step once you noticed the water?
A. I started throwing towels on the ground.
Q. You said it was kind of like -- almost made it to the family room, like you could see it was kind of like seeping?
A. Yes.
Q. And once it started could you tell from -- is there a straight shot -- a straight line of sight, I guess, from there to seeing it coming out of the bathtub?

Page 39

MR. KELLOGG: From where? Sorry.
Q. (By Mr. Allbright) From the threshold of the family room?
A. Into the bathroom from the family room?
Q. Yes.
A. No. I saw the water in the hallway.
Q. Oh, okay. There's a door there, okay.
Just take me through that to the point that you got it cleaned up. What did you need to do to clean it up, just towels?
A. Towels and a Shop-Vac.
Q. And how long did it take to clean up?
A. I don't know. I couldn't tell you. It wasn't quick, though.
Q. It ruined dinner?
A. Yes.
Q. Did your wife help you --
A. Yes.
Q. -- or was this a Tom job?
A. No, she helped me.
Q. And if your son was there you would have made him help too?
A. Oh, yes.
Q. He would have helped?
A. Yes.

Page 40

Q. He's a good boy?
A. Yes.
Q. Was the water still coming once you saw that it was coming from the tub?
A. I don't recall. I know that when we cleaned up the water was no longer coming out, but when I went in there it was still cascading over the bathtub.
Q. So it was like a battle, I guess?
A. Yes.
Q. You cleaned up -- you were cleaning the -- you were kind of like converging on the bathroom from the other two rooms where the water was?
A. Right.
Q. And cleaning as you went and by the time you got to the bathroom there was still some water overflowing the tub? Is that ---
A. Again, it was a long time ago. From what I recall we walked in to see where the water was coming from. It was cascading over the bathtub.
At that time we just started grabbing towels trying to mop up what we could. I don't know when it stopped cascading over, but it did eventually.

Page 41

Q. Is there anything that you think you did that stopped it from coming?
A. No.
Q. You didn't turn off the valves or anything?
A. No.
Q. The master bath has a tub as well. Correct?
A. Correct.
Q. And that did not back up?
A. No.
Q. Had you had any issues with the toilet in that guest bathroom prior to that?
A. Other than your typical backups, you know, where you snake it, no.
Q. So you would have to snake the --- You're talking about snaking the toilet ---
We talked about snaking before with the tubs. You also had to snake the toilet at times or you're referring to like using a plunger?
A. Using the plunger in the toilet. I mean we've snaked like everybody has snaked at the house, clogged from hair or something gets in the system, but it's just your typical normal.
Q. Right, but to the best of your recollection you weren't having any issues with the toilet at that

Page 42

time --
A. No.
Q. -- like where it was constantly running?
A. No.
Q. Making that annoying sound?
A. No.
Q. Those flappers don't work very well. I'm tired of replacing them myself.
So once the water stopped, it was just kind of like leveled off in the tub?
A. Yes.
Q. And then did you try to pump the water out of the tub with the Shop-Vac or did you just wait for it to hopefully go back down the drain?
A. Both. I was Shop-Vac-ing the floor in the bedroom, closets, and then went into the bathroom. I don't recall how much was out of the bathtub at that point, but whatever was left in there we soaked up with towels and the Shop-Vac.
Q. So you're not sure how much water, if any, drained back out of the tub at that point?
A. Right.
Q. So after you dried it up did you call anybody, call a plumber, call anyone?
A. Not that night.

Page 43

Q. Did you call a plumber the next day?
Did you call anybody the next day or in the vicinity?
A. I'm sure I called someone the next day. I'm not, you know -- it's a long time ago, but I'm sure I called someone the next day.
Q. Would that have been either Bob's or Bay?
A. Correct.
Q. Did somebody come out?
A. I don't recall but, again, it was a long time ago. I'm sure at some point in time someone came out and looked at it.
Q. Was that a bathroom that at that point in time was not used too often?
A. It was used. Yes, it was used.
Q. And the tub itself, was the tub itself used, whether a tub/shower combo?
A. Yes.
Q. Were there any -- was it then ---
Did you have that snaked?
A. I don't recall.
Q. Do you recall using that tub or shower after the overflow?
A. Sure. Yes, I'm sure we used it.
Q. No other draining issues?

Page 44

A. Only the ones that I had mentioned that we had to have someone come back out.
Q. Right, but the next time you went to use that tub or shower after the overflow ---
A. Not that I'm aware of. Immediately thereafter? No.
Q. I'm sure you would have wanted someone to come out pretty quickly --
A. Yes.
Q. -- to do the snaking?
A. Yes, right.
MR. KELLOGG: We have been going about an hour. Is now a good time to take a break?
MR. ALLBRIGHT: Yes, that's fine. We're right at a section to break. So, yes, that's fine.
MR. KELLOGG: Five minutes, okay.
THE VIDEOGRAPHER: We are off the record. The time is 9:52 p.m.
(Thereupon, a recess was taken.)
THE VIDEOGRAPHER: We are now going back on the video record. The time is 10:01 a.m., Media No. 2.
Q. (By Mr. Albright) Sir, is there anything about your testimony so far that you need to change or clarify?

Page 45

A. No.
Q. I just ask that, it happens. It is not to suggest anything. I will ask you that after each break.
So did you report the overflow to your insurance?
A. Yes.
Q. To State Farm?
A. Yes.
Q. When?
A. I don't know the exact date.
Q. The date I have is June 7, 2018, exactly one week later. Do you have any reason to dispute that?
A. If that is what is on State Farm's, that is when I probably called them.
Q. Do you know of any reason why you didn't report it sooner, like the next day?
A. No.
Q. How did you report it?
A. I either called them or did it online.
Q. Do you have any of your own notes regarding your call or when you called it in?
A. No.
Q. Do you remember who you spoke with at State

Page 46

Farm?
A. No.
Q. It was you that called it?
A. Yes.
Q. Not your wife?
A. Yes.
Q. Was she present when you called it in?
A. No.
Q. What did you report to State Farm?
A. I don't recall exactly, just probably told them the event that happened.
Q. At that point had you already called a plumber?
A. I don't recall.
Q. Did State Farm -- did the person at State Farm suggest that you should call a plumber or say anything about that?
A. I don't remember the conversation.
Q. Did you have any phone conversations with anyone at State Farm regarding the claim?
A. At that time?
Q. Yes, prior to someone coming out.
A. I don't recall. I am sure I talked to them a couple times before someone came out.
Q. So you do remember someone come go out?

Page 47

A. Yes.
Q. Do you remember who that was generally, like what they were?
A. No.
Q. Their name?
A. No, no clue.
Q. Do you recall the first inspection occurred?
A. I do not.
Q. The records I have show that it was June 13th. Do you have any reason to despite that?
A. I couldn't tell you if that is correct or that is wrong. I really don't remember.
Q. Were you present for the inspection?
A. Yes.
Q. Was anyone else present or was it just you and the adjuster?
A. I guess it was just myself and the adjuster.
Q. Your wife would not have been home at the time?
A. At that time I doubt it. She might have been but I don't think she was.
Q. Pre-COVID she probably works --
A. Correct.

Page 48

Q. In a not virtual --
A. She was at the hospital, correct.
Q. So it's you and the State Farm adjuster that came out?
A. Correct.
Q. Do you remember his name?
A. No, sir.
Q. Could you describe him?
A. No.
Q. Did you speak with him when he was there?
A. Yes.
Q. Were you with him the whole time?
A. Yes. He was in the house. I was with him.
Q. Like he went to the room, you went to the room; he went to there, you went to there?
A. Correct.
MR. KELLOGG: Scott, let me just put it on the record. It has been preserved at that hearing, but we object on relevance grounds any of the questions about inspection and the background of the claim and everything.
Obviously you can ask your questions, but I just want to put on the record that we continue to say that this type of thing isn't relevant to the claim.

Page 49

MR. ALLBRIGHT: Understood. Fair enough.
Q. (By Mr. Allbright) Did he go through the whole house at that point when he came out?
A. I don't recall. I know he was in the two bedrooms and bathrooms. Where else he went I don't recall.
Q. Do you recall anything specific that you told him while he was there?
A. No.
Q. Do you recall anything specific that he said to you?
A. No.
Q. Did he ask you any questions?
A. I don't recall.
Q. Did you ask him any questions?
A. I don't recall.
Q. How long was he there?
A. I couldn't --- I don't recall how long he was there for.
Q. Did you take any pictures while he was there?
A. I don't think so.
Q. Did he take pictures?
A. I think so. I'm not positive, but I would think he would have.

Page 50

Q. He seemed to be taking pictures?
A. Yes, I would assume he was. I don't recall if he did or didn't, but I would assume part of his adjustment job is to take photos.
Q. Did you guys discuss anything when he had finished his inspection?
A. I don't recall.
Q. Did you ever speak with him again after he left that day?
A. Not that I recall, no.
Q. Like "here is my card, call me with any questions," that type of thing?
A. I don't remember.
Q. Do you recall an engineer coming out to inspect the house?
A. They sent some guy out when I --- Yes, they did. I guess he was an engineer. They sent someone out after he was there.
Q. Subsequent to the initial inspection, you're saying?
A. I think it was after we --- It was down the road that they sent an engineer out.
Q. So based on my records the engineer was out there on June 25th of 2018 --
A. Is that what it is?

Page 51

Q. -- so give or take two weeks after.
A. If that's what it says. I know they sent someone out. I don't know if it was two days, two weeks, two months. I know that there was a guy that came out and did another report.
Q. And who was there when that inspection occurred?
A. Me.
Q. Just you?
A. To the best of my knowledge and remembrance, yes.
Q. And, again, most likely it would have been you?
A. Most likely it was just me, yes.
Q. Was that person alone?
A. Yes.
Q. So just you and him?
A. Correct.
Q. Just some of these are going to be kind of repeat questions with the adjuster, so bear with me.
Do you recall what he said when he arrived?
A. No.
Q. Did he describe his purpose, what he was doing?
A. Not at all. I don't recall any of the

Page 52

conversation with him.
Q. Do you recall his name?
A. No.
Q. Appearance?
A. No.
Q. Were you with him the whole time he was in your house?
A. Yes.
Q. What did you observe him doing when he was in your house?
A. I don't recall what he was doing.
Q. Were you with him at all times?
A. Pretty much, yes.
Q. "Pretty much," so not completely?
A. I mean I don't recall, but I would assume that I was with him the entire time. I might have stepped away for a second or two, but we weren't holding hands.
Q. It probably would take longer that way.
Did he inspect the whole house?
A. I don't recall.
Q. Did you point him to the -- I assume you pointed him to the tub?
A. Yes.
Q. Do you recall anything specific that you

Page 53

told him while he was at your house?
A. I'm sorry, repeat that.
Q. Do you recall anything specific that you said to him when he was at the house?
A. No. I'm just going off of, you know, the best memory I have, just him coming in saying where was the event and, you know, showing him the bathrooms and whatnot.
Q. Do you recall anything specific that he said to you while he was there?
A. No.
Q. Did he ask you any questions?
A. I don't recall.
Q. Did you ask him any questions?
A. I don't recall.
Q. How long was he there?
A. I don't recall.
Q. Did you take any pictures or videos while he was there?
A. Most likely not.
Q. Did he?
A. Did he? Again, I would assume as part of his report he would had to have, but I don't recall.
Q. Did he say anything to you when he left?
A. "Good-bye."

Page 54

Q. Did you say anything to him?
A. No. "Good-bye, get out."
Q. I was going to say you didn't say good-bye?
Did you ever speak to him again after he left?
A. Not that I recall.
MR. ALLBRIGHT: Exhibit 2.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 2.)
Q. (By Mr. Allbright) This starts at Bates SF000164. It is a Report of Findings of the Pronet Group, Inc.
Do you have that in front of you, sir?
A. Yes.
Q. Have you seen this before?
A. I would guess I did after he did it.
MR. ALLBRIGHT: And I will preface just for the record that it is a photocopy. It is not the original and it does not include attachments, which I believe included a sketch and some photographs because the copy did not print out that way so it wasn't worth doing.
Q. (By Mr. Allbright) There is only one place in here that I wanted to direct your attention to.

Page 55

So if you would turn to Page 5 of the report, the Bates page is 168. If you're not familiar with the term Bates, it's lawyer-speak for page numbers.
A. Okay, I found it.
Q. That's how we identify everything.
A. Okay.
Q. So Section V, Discussion, Interview. It says, "The following information was obtained from Mr. Barbato and/or from official sources regarding history of the residence."
Then flip to the next page. The report says --- Can you read the second bullet starting "On May 31st." Just read it to yourself.
A. Okay.
Q. Have you had a chance to read that?
A. Uh-huh.
Q. Is that accurate, sir?
A. Yes. If that is what he put in that is probably what I told him.
Q. Do you have any reason to dispute that?
A. No. Again, it's seven, eight years ago.
Q. This says your wife and son ---
A. My son was there, yes.
Q. It says, "closed the toilet valve and

Page 56

stopped using the bathroom."
Does that jog your memory?
A. No, but if that's what it says that's what we did. I don't recall doing that, but...
Q. It says, "Approximately a week later he," -- I assume that is you -- "opened the toilet valve, used the bathroom, and two days later, he," -- I assume that's you -- "observed sanitary water in the bathtub only."
Does that track for you, sir?
MR. KELLOGG: Object to the form. You can answer if you understand.
A. Again, if that's what it says that's what I told him. I mean I don't remember exactly everything that happened that day, but...
Q. (By Mr. Allbright) Okay, that's all I need from that.
Are you familiar with a person --- Strike that.
Do you know what a public adjuster is?
A. Yes.
Q. Did you retain a public adjuster in relation to the claim?
A. I don't know if he was a public adjuster or if he was an appraiser, but not at this point, no.

Page 57

Later on down the road, yes.
Q. Okay, fair distinction.
If memory serves I do think your appraiser was also a licensed public adjuster, but that's ---
A. Like I said, I don't know how -- if he was hired as a PA, a public adjuster, or if he was hired as an appraiser. That was down the road, though.
Q. But not at the -- you said not at the early stages of the claim?
A. Right. Yes, I believe that's correct.
Q. You typically would have signed something where they were getting a percentage of any recovery?
A. Yes, so that would have been after. Yes, it was not at this stage.
Q. So at some point you signed something giving a percentage of the recovery?
A. When I am hired them I'm sure I did. I don't recall exactly what it said.
Q. And just so we're talking about the same person, this is who?
A. I believe his name was Murphy.
Q. James, James Murphy?
A. Probably, yes. That sounds right.
Q. To the best of your recollection did you have anything signed, did you sign anything for

Page 58

Murphy, James Murphy?
A. At this point?
Q. At any point.
A. Yes, down the road, yes.
Q. And what was that?
A. I don't recall. I know I had an agreement with him, but I don't know what he called it.
Q. Do you have a copy of that?
A. No.
Q. Did he give you a copy of it?
A. Yes.
Q. It's just gone with time?
A. Yes. I mean I'm sure if I dug through my office I might be able to find it, but I don't recall. It might be thrown away, quite honestly, I don't know.
Q. And did it convey to him a percentage?
A. I don't recall.
Q. Do you recall ever paying Mr. Murphy anything?
A. Yes.
Q. When?
A. After the settlement, after there was an appraisal that went through.
Q. How much did you pay him?

Page 59

A. I don't recall.
Q. How did you pay him, the manner of payment, cash, check, Zelle, Venmo?
A. It wasn't cash. It was either cash, credit card -- not cash, I'm sorry -- check, credit card or Zelle. I don't recall which one it was. Most likely a check, if I recall, but I'm not sure.
Q. And it was after the appraisal process was completed?
A. Correct.
Q. Had you ever -- I know you said you're familiar with public adjusters -- had you ever retained one before --
A. No.
Q. -- for any prior claim?
A. No.
MR. KELLOGG: Just let him finish his question for her.
Q. (By Mr. Allbright) That's one of those where you know where I'm going, but you jumped the gun.
A. Yes, sorry.
Q. Strike one.
A. This segment.
Q. Did you give Mr. Murphy any documents?

Page 60

A. I don't recall.
Q. I assume he came to your house at least once?
A. Yes.
Q. Do you know how many times he came?
A. No.
Q. Did he do an inspection and pictures?
A. Again, I don't recall exactly what he did.
Q. Assuming you paid him either by check, card or Zelle, would you have any way of determining how much that was? Is there a record you could look back to or find?
A. If my accounts go back that far online I might be able to find it, yes.
Q. Do you still have the same checking account?
A. Yes.
Q. The same credit cards?
A. No.
Q. And Zelle is checking accounts.
But you said it probably would have been a check?
A. Most likely.
Q. So when he came out --- Was there ever a point where it was you and him doing like a

Page 61

walk-through of the property similar to what you had done with State Farm's adjuster --
A. I don't ---
Q. -- or the engineer?
A. Sorry.
I don't recall what he and I did when he came out the first time, but I would assume that's what we did, yes.
Q. Would you have been with him the entire time that he was going through your property?
A. Yes, I would assume I was, yes.
Q. Do you recall anything specific that either you said to him or that he said to you?
A. No.
Q. I'm trying to combine the questions for you.
A. Thank you.
Q. Did he give you any kind of report or any documents?
A. Not that I recall off the top of my head.
Q. If he did, would you have kept them?
A. Most likely.
Q. Where would you have kept them if you did?
A. I don't know.
Q. Did you communicate with him by e-mail,

Page 62

text, phone calls?
A. Mostly by phone calls.
Q. Would there have been e-mails -- to either of the e-mails you mentioned earlier?
A. I'm sure there was e-mails, yes, but we communicated mostly through the phone.
MR. ALLBRIGHT: Exhibit 3.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 3.)
Q. (By Mr. Allbright) Exhibit 3 I have handed you, sir. The first page is an e-mail of November 7, 2018. Does this look familiar to you?
A. No, but it looks like it came from me.
Q. Is there any reason to dispute it coming from you?
A. No.
Q. So it says here in the e-mail, "We hired a plumber to inspect our plumbing system and have attached his findings. It looks like we have a plumbing problem and we need more money to fix it."
Then there is a report from Arko, A-r-k-o, Plumbing Corp. Correct?
A. Correct.
Q. How did you get in touch with Arko?

Page 63

A. I believe it was from --- Arko was probably from Knecht. I don't know if it was Mike or Stephen Knecht. Or it might have been my neighbor, I don't know.
Q. Mike Knecht being one of the attorneys --
A. Correct.
Q. -- in this case. Right?
A. Uh-huh, yes.
Q. And if it wasn't him you said maybe your neighbor?
A. Correct.
Q. And if it was your neighbor, which neighbor, who is that?
A. Chris Knecht.
Q. Same last name?
A. Yes.
Q. As far as you know is he a relation --
A. Yes.
Q. -- to them?
A. To them, yes.
Q. When did you first get in contact with Arko?
A. I don't recall. I mean this says date of inspection is 8-28-18, so at some point in time prior to that.

Page 64

Q. Why?
A. Why?
Q. Why did you reach out to them?
A. To do an inspection on the pipes to see what the problem was.
Q. Why them and not Bob's or Bay Plumbing?
A. At the time I believe that I called Bob's and he didn't have the camera.
Q. And Bay?
A. I didn't even try them.
Q. So you said at some point prior to August 28th, which is the inspection?
A. Uh-huh, yes.
Q. As far as your recollection, you have no dispute as to those two dates that you read?
A. Again, they're on the report, so I don't recall exact dates, but if that's what's on the report, then...
Q. You have no reason to doubt it?
A. Correct.
Q. That's all I want to know.
A. Yes.
Q. Like if you side no, I was in Paris --
A. No.
Q. -- for two weeks in August of 2018 ---

Page 65

A. That would not have been me.
Q. Do you recall someone from Arko coming out to do the inspections?
A. Yes.
Q. And do you recall them coming twice?
A. I know they came out twice, but I don't know why they came out the second time. I remember them coming out twice.
Q. That was going to be my other question, why the second?
A. Yes. I know they came out twice. I wasn't sure why -- I don't recall why they came the second time.
Q. Do you know who it was that came out?
A. No.
Q. Was it the same person both times?
A. I don't recall.
Q. Was it just you and that person?
A. Yes.
Q. Did they have like an assistant or a helper with them?
A. I don't recall.
Q. Were you with them --- The same questions. Were you with them during -- them, him -- during the time they were doing the video inspection?

Page 66

A. I would assume so.
Q. Sometimes they go up on -- I think sometimes they have to go up on the roof. Did you go up on the roof with them?
A. No.
Q. There's a limit?
A. Yes.
Q. Did they go inside your house?
A. Yes.
Q. What were they doing inside your house?
A. I don't recall.
Q. Were you with him or them while they were inside your house?
A. I would assume I was, yes.
Q. And no one else likely would have been home at the time. Correct?
A. Correct.
Q. And I'm guessing he must have gone throughout your house based on Exhibit 1 that we looked at earlier which says it was by Arko. That makes sense to you?
A. Based off of that, yes.
Q. Do you recall anything specific that you said to anyone from Arko?
A. No.

Page 67

Q. And vice versa, anything specific that they said to you?
A. No.
Q. At either time that they were there?
A. No, sir.
Q. Did he provide you a copy -- obviously he provided you with the plumbing report that is attached to your e-mail. Correct?
A. Yes, I would assume that's how I received it, via e-mail. I don't recall specifically, though.
Q. And did he give you like a copy of any actual videos?
A. Not that I recall, no. He might have, but I don't recall.
Q. And your communication with Arko, was that via phone, e-mail, both?
A. I don't recall. Probably by phone and e-mail.
Q. So you submitted this report to State Farm. Did State Farm then send anybody out?
A. I don't recall. I think they sent out Gables Plumbing.
Q. Coral Gables Plumbing?
A. Yes, I think so.
Q. That's what I had. I just wanted to check

Page 68

with you. And they also did a video?
A. Yes.
Q. The same questions for them. Did you speak with anyone from Coral Gables Plumbing when they were there?
A. The gentleman that they sent out, but no conversation. He came in the house. Same thing, in the house, on the roof, and went on his way.
Q. No specific questions one way or the other?
A. Not at all. No conversation at all.
Q. Eventually you filed a lawsuit in Dade County State Court. Correct?
A. I guess. What did you say, what court?
Q. Dade County in state court.
A. Yes.
Q. When was that?
A. I don't recall the exact date of that.
Q. I have a filing date of September 12, 2019. Does that sound about right?
A. If that's what you have and that's what it shows.
Q. That is what the Court has.
A. If that's what you have and that's what it has, I don't know the date.
Q. And at that point, sir, why were you suing

Page 69

State Farm?
A. Well, we had a lot more damage than what they had said and paid.
Q. And was this primarily based on the results of the Arko Plumbing video and what that told you?
MR. KELLOGG: Object to the form. You can answer.
A. Yes, it was the overall --- Yes.
Q. (By Mr. Allbright) Because I think there is a reference in there, 30-something thousand dollars or something to that effect?
A. If that's what's in here, yes.
Q. The third page.
MR. KELLOGG: This is Exhibit 3?
MR. ALLBRIGHT: Yes, Exhibit 3.
Q. (By Mr. Allbright) Barbato 113.
A. $37,395.
Q. So at that point you were seeking -- you sued because you wanted more -- you're seeking more money from State Farm to make repairs?
A. Correct.
Q. And then -- so at some point State Farm moved to --- Strike that. I'm trying to make this maybe less legally.
At some point after that, was that when you

first heard of an appraisal?
A. Yes.
Q. And what was your understanding of appraisal at that point?
A. That we get someone that does an appraisal to do the work and State Farm gets someone to do the same thing. If they disagree, then it goes either to court or to an umpire.
Q. Umpire, yes.
Were you in agreement with going to appraisal when it was first brought up?
MR. KELLOGG: Object to the form. You can answer.
A. I didn't know I had an option. I just thought that's what we had to do. I mean that's -- I let the attorneys handle that.
Q. (By Mr. Allgright) Are you aware that there was --- Strike that. So the original suit ---
Don't worry, you don't need to look at this whole thing.
A. Okay.
MR. ALLBRIGHT: I'm going to hand you a very large paper. Don't feel the need to look at anything more than the first page for right now.
This one I didn't print copies of to save



the trees.
That is going to be Exhibit 4.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 4.)
Q. (By Mr. Allbright) So this is the Complaint filed in Miami-Dade County. Do you see that from the first page?
A. Yes.
Q. Have you seen that document before?
A. I'm sure I did way back when.
Q. And do you see there are several numbered paragraphs?
A. Okay.
Q. Number 1, what is it that you're seeking?
A. This is an action for breach of contract.
MR. ALLBRIGHT: This will be Exhibit 5. This is the Amended Complaint.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 5.)
Q. (By Mr. Allbright) Have you seen this document before, sir?
A. I'm sure I did at some point in time.
Q. What does the first numbered paragraph



state?
A. This is an action for declaratory judgment.
Q. Do you know what the reason for the amendment was?
A. I don't recall.
Q. You were still seeking additional money from State Farm?
A. Correct.
Q. There was no payment that was made between the two Complaints?
A. No.
Q. Do you know what a declaratory judgment is?
A. No.
Q. You can give that to her.
Sir, so I will represent to you based on the record that the appraisal process was opposed. State Farm moved to compel appraisal and your position, you and your wife's position, was against appraisal at that point.
A. Okay.
Q. Do you recall there was an appeal?
A. Yes.
Q. You probably know of two appeals. Correct?
MR. KELLOGG: Object to the form. You can answer.



Q. (By Mr. Allbright) You know this case went up on appeal that we're in right now?
A. That's correct.
Q. Do you recall an appeal with the first case?
A. Yes.
Q. Do you know what the basis of the appeal was in the first case?
A. I don't recall. I believe it might have been appraisal.
Q. Do you recall seeking a deposition of State Farm in the state court case?
A. That would have been the attorneys. I don't recall.
Q. At that point in time why were you opposed to appraisal?
A. Again, I don't recall what the legalities of it was or why we did that. I just thought that based on the conversations I had with the attorneys that we should have not had to go to appraisal.
MR. KELLOGG: Don't reveal the contents of any communications you had with your attorneys. You don't have to do that. You didn't, which is fine. I'm just warning you not to get into that.
Q. (By Mr. Allbright) We were both ready to

Page 74

stop you there.
Ultimately the end result was that the appraisal was going to go forward. Correct?
A. Correct.
Q. At the end of the day after the appeal?
A. Correct.
Q. Do you recall there being yet another, I guess, inspection or inspections for the appraisal?
A. With -- yes, yes, yes.
Q. Is that the point in time that Mr. Murphy got involved?
A. Correct.
Q. Do you recall how the appraisal inspection or inspections were arranged?
A. No.
Q. Do you recall when they occurred?
A. No.
Q. Were you present when they occurred?
A. Yes.
Q. Was anyone else, meaning your wife, present?
A. Not that I recall, no.
Q. And probably not?
A. Probably not, no.
Q. For those inspections who was it that came

Page 75

out?
A. To the best of my --- Are you referring to State Farm or to ---
Q. Once it was in the appraisal process. I know there were a lot of inspections, I understand, but once you were in the appraisal process.
A. Mr. Murphy came out and State Farm sent someone out.
Q. Do you remember who the person was that State Farm sent?
A. No, I don't.
Q. Would you remember the name if I said it?
A. I might.
Q. Bob Davis?
A. I don't know.
Q. That's a pretty --
A. That's a simple, easy name.
Q. -- that's like Tom Jones.
That's fine. I'm sure you know lots of Bobs.
A. Yes, I do, as a matter of fact.
Q. When the appraisal inspections occurred were you with the gentlemen doing the inspections?
A. I would assume I was with them both, yes.
Q. Did you have any discussions with them when

Page 76

they were at your house?
A. Not that I recall.
Q. Is there anything specific that either of them asked you or that you asked either of them?
A. No, not that I recall.
Q. Did either of them ask ---
Do you recall how long they were at your house?
A. No.
Q. They took pictures, I assume?
A. I would assume they did, yes.
Q. Did they come back a second or subsequent time?
A. I don't recall. I know they came to meet the umpire. In between that I don't recall.
Q. So the umpire also came out to your property?
A. Yes.
Q. That was a different day than when the appraisers first came out?
A. Yes.
Q. They came back too, so it was all three of them?
A. Correct.
Q. Again, I will go through the same

Page 77

questions. Do you recall what day that was?
A. No, sir.
Q. Was it just you of your family who was at the house?
A. Correct.
Q. So you and the three gentlemen?
A. Yes.
Q. Did you discuss anything with them?
A. I did not. I was not involved in the conversation.
Q. Once it was the three of them?
A. Correct.
Q. So you gave access and they went about their business?
A. Correct.
Q. Did they ask you anything or did the umpire ask you anything?
A. No.
Q. Did you ask them anything?
A. No.
Q. Did you speak with the umpire at all?
A. No.
Q. Do you know who that was?
A. No.
Q. Would you know his name if I said it?

Page 78

A. Maybe.
Q. We'll get to it.
Were you party to any discussions that they were having with the umpire while they were at your property, the appraisers?
A. I was not included, no.
Q. When it was the appraisers and the umpire at your house, how long was that, how long were they there?
A. I don't recall. It wasn't a long time.
Q. Was it less time than the appraisers had been there?
A. Yes.
Q. Jesus Rodriguez, does that ring a bell?
A. That could be it. If that's what's on the report that's it.
Q. So was there ultimately --- Strike that. Ultimately there was an appraisal ordered. Correct?
A. Correct.
Q. Or we would not be sitting here today?
A. Correct.
MR. ALLBRIGHT: This is Exhibit 6, the appraisal award that includes the estimate prepared by Umpire Professional Service.
(Thereupon, the document referred to was

Page 79

marked for identification as Defendant's Exhibit No. 6.)
Q. (By Mr. Allbright) Take a look at that if you would, sir. Is that the appraisal award --
A. It looks like it.
Q. -- for your property, for your claim?
A. It looks like it, yes.
Q. The estimate that is attached to it, the second through 30-something page, have you seen that part before?
A. Yes.
Q. Do you know who prepared that?
A. I do not. I would assume it was the umpire.
Q. Looking at Page 1, again, this is Barbato 81, Bates stamp, there is two signatures on here, sir. Correct?
A. Okay.
Q. Can you tell me who signed it?
A. James Murphy and Jesus Rodriguez.
Q. James Murphy is the gentleman we were speaking about earlier?
A. Correct.
Q. Because, again, James Murphy is a common name.

Page 80

A. Right.
Q. Was this signed in your presence?
A. No.
Q. Does it indicate when Mr. Murphy signed it?
A. It's dated 8-31-22.
Q. And does it indicate when Mr. Rodriguez signed it?
A. 9-1 --- I can't read what he ---
It looks like he has 32 there.
Q. It does look like a 32 to me, but I think we can all agree that that's 22.
It certainly isn't 2032 yet.
A. No.
Q. If it was 9-1-32 we probably wouldn't be sitting here.
A. No.
Q. I assume you have seen this document before?
A. I'm sure. Most likely.
Q. Just the award. Just the award, just the first page.
A. Again, I'm assuming it was e-mailed to me or sent to me at some point in time.
Q. Do you know when you first received it?
A. No.

Page 81

Q. If it was e-mailed to you who would have e-mailed it to you?
A. I don't know. I don't know who it would have come from. I have no idea.
Q. Do you have an understanding, sir, as to how the award is considered finalized or effective based on signatures?
A. I don't know.
Q. Do you know who needs to sign an appraisal award?
A. No, sir.
Q. Do all three need to sign it?
A. I don't know.
MR. KELLOGG: Do you have another copy of this?
MR. ALLBRIGHT: I have another copy that's attached to something. You can look at that.
MR. KELLOGG: I just want to follow along.
Q. (By Mr. Allbright) Do you know when State Farm received the appraisal award, Exhibit 6?
A. I would have no way of knowing that.
Q. And when I say "State Farm receiving it," I am referring to the exhibit that you have that is signed by your appraiser and the umpire.
A. Okay.

Page 82

Q. Based on the signature of the umpire, would you agree with me that the earliest possible date that State Farm received this was September 1st?
MR. KELLOGG: Objection to the form. You can answer.
A. They could have received it at any point in time. That's just when this guy signed it, so I couldn't tell you when State Farm received it.
Q. (By Mr. Allbright) I am saying the earliest possible time.
MR. KELLOGG: Same objection. You can answer.
A. The earliest possible time they could have received it was the day he completed it, no?
Q. (By Mr. Allbright) September 1st?
MR. KELLOGG: Object to the form.
A. That's when he signed it. That doesn't mean that's when he completed it.
Q. (By Mr. Allbright) Right. I'm talking about a copy of this with the two signatures on it, assuming the September 1st date put there by the umpire is correct.
A. That's the date he signed it.
Q. Right.
A. Are you referring to the one that's signed

Page 83

or just could they have received it prior to him signing it?
Q. Signed, because prior to it being signed it means nothing.
A. I'm not an attorney.
Q. I'm simply asking you -- that's why I'm asking you ---
A. I mean the day he signed it is September 1st. If you're asking me the earliest they could have received it, obviously the day he signed it.
Q. Did State Farm issue a check in response to the appraisal award?
A. Yes.
Q. When?
A. I don't know the date.
Q. Who was the check payable to?
A. I believe it was to myself, my wife, and to Chase, the mortgage holder.
MR. ALLBRIGHT: This is Exhibit 7.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 7.)
Q. (By Mr. Allbright) Exhibit 7 appears to be a copy of the check that you received for the

Page 84

appraisal award?
A. It appears to be so.
Q. And you were, I believe, correct as to the payees?
A. Yes. It has my name, my wife's name and JP Morgan Chase.
Q. Is there a date on the check?
A. 10-10-22.
MR. ALLBRIGHT: This is Exhibit 8.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 8.)
MR. ALLBRIGHT: For the record, this is Exhibit 8. It is Bates stamped starting at Barbato 126.
Q. (By Mr. Allbright) Does this look familiar to you, sir?
A. No. I'm sure I got it at some point in time.
MR. KELLOGG: Take your time and read it if you need to.
Q. (By Mr. Allbright) Obviously it says it was sent to Michael Knecht.
A. Right, yes. I think I got this one. I think I got it --- I think it accompanied the check.

Page 85

Q. Was the check ultimately sent directly to you or to your attorney?
A. That I don't know where it came from.
MR. KELLOGG: Take a look at the whole document before you answer questions. Flip through it, at least.
A. I think I got a copy of this. Again, I'm not positive, but I'm pretty sure I got a copy of it when I received the check.
Q. (By Mr. Allbright) After receiving the check, what happened next?
MR. KELLOGG: Object to the form.
A. As far as?
Q. Strike that. Strike that, I'll withdraw the question.
At the point that you received the check was the lawsuit that you had filed still going on?
A. We had -- this was the end ---
Again, I'm not an attorney, so I don't know if that was the end of the lawsuit, but as a layman I would assume that that was, you know, this claim or this case, I guess you call it, was settled based on the umpire and the appraisal.
Q. In terms of that litigation do you know what happened next?

Page 86

MR. KELLOGG: Object to the form.
A. What happened to what?
Q. (By Mr. Allbright) The litigation that was in Miami-Dade County State Court.
A. On my claim that we're referring to?
Q. Yes, that was originally filed in 2019.
A. I don't know what would happen after that. I don't know what the attorneys have to do.
Q. The court file indicates that on November 7, 2022, there was a voluntary dismissal without prejudice that was filed by Mr. Knecht.
MR. KELLOGG: Do you want to mark that?
Q. (By Mr. Allbright) Does that seem about right to you?
A. Yes.
MR. ALLBRIGHT: That will be Exhibit 9.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 9.)
Q. (By Mr. Allbright) Have you seen this document before, sir?
A. I don't recall seeing this one. I'm not saying I didn't get it, but I don't recall seeing it.
Q. Do you know what it means to dismiss a case?

Page 87

A. No.
Q. Did you authorize the case to be dismissed?
MR. KELLOGG: Object to the form. You can answer.
A. I may have. I don't recall.
Q. (By Mr. Allbright) Is there any reason to think that you saw that dismissal form before it was filed?
MR. KELLOGG: Object to the form.
A. I don't know.
MR. ALLBRIGHT: This is a good break spot.
THE VIDEOGRAPHER: We are going off the record. The time is 11:18.
(Thereupon, a recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:39, Media No. 3.
Q. (By Mr. Allbright) Welcome, back, sir.
A. Thank you.
Q. As before, is there anything that you need to update, clarify, regarding your testimony so far?
A. Not at this point.
Q. You received the check in the fall of 2022. Have you made any repairs to the house relating to the claim since then?
A. Yes.

Page 88

Q. What have you done?
A. Eliminated all of the cast iron pipes and replaced -- not replaced -- redid all three bathrooms.
Q. You said eliminated the cast iron. How was that done?
A. I hired a plumber and he came out and put in PVC piping.
Q. Did they end up needing to --- How was it done? Was it dug up?
A. The bathrooms were redone and dug up on the outside and the same thing with the kitchen.
Q. If you can look at Exhibit 1, Exhibit 1, the red lines, the key indicates that that's cast iron drain lines to be replaced.
So were those -- that one looks like it runs through the guest -- from the guest bath through the master bedroom into the master bathroom?
A. He was able -- he was -- from the guest bath -- the master -- that has been abandoned and he ran a new pipe to the septic tank, PVC.
Q. So that went, I'm assuming, out kind of adjacent to where the guest bath is?
A. Correct.
Q. And then over to the septic?

Page 89

A. Correct.
Q. And the line -- you said that line was abandoned that ran under the master?
A. That is correct.
Q. And what about the line, the red portion of the line that runs more or less from the kitchen through to the master bathroom?
A. That was also abandoned and he went through the patio to behind the other bathroom where it says Bedroom 3.
Q. I don't see Bedroom 3.
A. On that side, on the other ---
Q. Oh, I see that labeled as Bedroom 1. I see that labeled as Bedroom 1.
A. Oh, I'm sorry. I told you I can't see.
Q. So there's a line that goes from basically the kitchen sink?
A. Correct.
Q. Out and around?
A. To that bathroom.
Q. I assume there's another line somewhere over there.
A. Yes. That was not a part -- this was over here. There's a septic tank over here.
Q. Can you show that for the video.

Page 90

A. Sorry. There's a second septic tank over here.
Q. Okay. So you've had two septics on the property?
A. As long as I've owned it, yes.
Q. I never knew anyone who was lucky enough to have two septic tanks.
A. They had the original permit from the original owner.
Q. Usually one septic presents enough problems.
A. Double your problems.
Q. I mean I guess based on the situation.
So that line goes around and to the septic from there, okay. So that was also abandoned.
There is also some blue lines on here that say PVC drain lines to be replaced.
A. I believe that he ran new PVC -- that is PVC from when we renovated the house, but I believe the way he did it was he came -- he ran it parallel, but outside.
Q. So the line is out the kitchen wall, the wall outside there?
A. Right.
Q. And I guess that's mainly -- that's really

Page 91

mainly for the -- the purpose of that line is for the laundry?
A. Correct.
Q. So that line is now outside of the house and then it picks up on the line that goes to the second septic that is outside Bedroom 1?
A. Correct.
Q. So that line also has been abandoned?
A. Correct.
Q. The sewer systems of Old Town Europe.
I have a lot of blue ink on here, but I think there was also some blue PVC to be replaced under the master bath area?
A. Yes, correct.
Q. I know you said you redid those. Was that line salvaged or is that abandoned or what happened there?
A. He jackhammered this floor in here.
Q. The master bathroom?
A. Yes.
Q. Okay.
A. And he redid all the PVC in there as well. I think the only one he didn't redo was the bidet. Everything else is new in that bathroom.
Q. Okay. And the bidet, I see two little

Page 92

spots there in the master bath?
A. Correct.
Q. So the only place that he needed to break through the floor was the master bathroom?
A. No, he did all three bathrooms.
Q. Oh, sorry, okay. Oh, right, because that was under the toilet. Okay.
The third bathroom being the one that's identified as Bedroom 1 bath?
A. Right.
Q. You said you redid all three of the bathrooms. Right?
A. That's correct.
Q. In each of the bathrooms he did the jackhammer and put in the new PVC?
A. Correct.
Q. And I assume there was always a line from that Bedroom 1 bath to the septic over there?
A. Correct, and that was also replaced.
Q. Just to kind of recap, there is no more functional cast iron pipes there, they are just tapped off?
A. Correct.
Q. And everything is PVC that's more or less two or three years-old?

Page 93

A. Not even. We just finished recently.
Q. I was going to ask you when it was done.
A. It was probably less than a year ago.
Q. And who was it that did the work?
A. General contractor Tom Barbato.
Q. You didn't tell me about that license.
A. Bob's Plumbing did the demo and the plumbing work. I did the drywall with a friend of mine that's a drywall contractor. He did it, I watched. Bob came out, Bob's Plumbing came out and did the finish work and a tile installation guy did the tile work and I don't know his name. He didn't speak English.
Q. How did you find him?
A. He did some work in my daughter's house a few years ago.
Q. And I was going to say or you just drove up and down 87th Ave.
A. No, he actually did good work.
Q. I know that's tile central.
A. I didn't go there.
Q. So you said Bob's did demo and also the installing of the new ---
A. Correct.
Q. Who is it that did the drywall?

Page 94

A. A friend of mine. He's a handyman. His name is Bert, B-e-r-t, Roberts.
Q. And when did they -- I guess when did the demo start and when did it finish?
A. We did one bathroom at a time so that we didn't have to leave the house. So it took us about a year to do all three bathrooms and we probably started about a year ago, roughly.
Q. Sometime in the fall of '24, roughly?
A. Yes, summer, fall or summer of '24.
Q. It's usually better to do one bathroom at a time, not all three at once.
What had you go with Bob's instead of the Arko estimate?
A. I just used him. He has done all my plumbing work in the past and he has done work for other people that I know.
Q. And I assume the idea of not digging up all of the floors throughout your house was probably appealing?
A. Yes.
Q. Did you have any estimates or contracts or anything with Bob's for the demo and the replacement?
A. I just paid him as he went. I bought all the materials -- well, not the pipes, but the

Page 95

vanities and toilets and all that. I went out and bought them. I don't even think he gave me an estimate. I think I just went with him because he did a couple houses in the neighborhood and they were happy with him. I let the neighbors do the work on the estimates.
Q. I know you said you used Bob a couple times before. Let me just make sure because I know Bay Plumbing I've heard of.
Bob's Plumbing is the name of the company --
A. Correct. Bob's ---
Q. -- or this is Bob the guy?
A. Bob was the original owner.
Q. Since 1958 Bob's Plumbing has served Miami and Miami-Dade County.
Does that sound about right?
A. Yes.
Q. He even has a Facebook page.
A. Does he really?
Q. It's probably one of the grandchildren.
A. He works there.
Q. So we got the pipes, the drywall. Where was the drywall needed, in the bathrooms?
A. In the bathrooms, yes.

Page 96

Q. And then obviously the bathroom floors, the floors are tile, they were done by the guy and the walls are tiled on top of drywall, or partially?
A. What do they call that, Durock?
Q. Yes.
A. And then the other parts of the bathroom is just regular drywall.
Q. Were there any other repairs that needed to be done in what's listed on here as the office or Bedroom 2?
A. We did some stuff, but that was a while back. I just painted and put Kilz and stuff like that.
THE STENOGRAPHER: I'm sorry, Kilz?
THE WITNESS: Kilz, K-i-l-z.
MR. ALLBRIGHT: Yes, it's a paint.
It's a paint that prevents mold growth or kills mold or something like that.
Q. (By Mr. Allbright) So nothing ended up -- the kitchen ended up being unscathed?
A. For now, yes. We still have to do little things in there, but yes.
Q. I mean it's a 25 year-old kitchen. I'm sure your wife --- I will ask her.
A. It's a high quality kitchen, so we're

Page 97

trying to save the cabinets, but they had to do some holes in them, so we've go to fix those. I don't know if she knows about those holes yet.
Q. The best estimate on the total for redoing the bathrooms, the pipes, all that?
A. My wife asks me the same question and I don't know. We go to the store and it's, "Oh, I like that toilet, buy that toilet." It sits in the garage. Go buy a vanity. I would put it somewhere around 70, if not more.
Q. That's 70,000 US dollars, not 70 Bitcoin?
A. That's correct.
Q. We're talking the whole kit and caboodle?
A. Yes.
Q. Under 100?
A. Yes. We're not done yet, but yes.
Q. Bob and the drywall guy and the tile guy, check, cash, how were they paid?
A. The plumber, Bob's, it was a combination of checks and credit card. The tile guy was -- I think it was Zelle and check. I think, I'm not positive, but I think. Then drywall, that was cash.
Q. There was an inspection, a moisture inspection, at some point. Do you recall that?
A. Vaguely.

Page 98

MR. ALLBRIGHT: Exhibit 10.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 10.)
Q. (By Mr. Allbright) This is Barbato_Knecht Page 1. Take a look at that.
First of all, the pictures in there, that is your house?
A. Yes.
MR. ALLBRIGHT: It's not stamped confidential, Jason. It says "Client and work product privilege." I don't think that is being asserted as to this document.
MR. KELLOGG: It hasn't been logged and no.
This was produced as part of the Knecht part.
MR. ALLBRIGHT: I've never seen a water mitigation report that was privileged.
MR. KELLOGG: This is part of the file that the judge asked for us to turn over.
MR. ALLBRIGHT: I'm just making sure I don't have to do anything special for record purposes.
Q. (By Mr. Allbright) So this says it was April, 2021. Does that sound about right, sir?

Page 99

A. I guess, yes.
Q. Do you know why they came out when they did?
A. I don't. I don't, no.
Q. Do you know what they were doing?
A. I believe they're checking for moisture in the floor.
Q. Did they do any work after it or did they just give you this report?
A. They didn't do any work, no.
Q. The pictures in here, were those a fair representation of what the house looked like at that point in time and I guess in 2018 as well?
A. Yes.
Q. Are you familiar with a document called an Assignment of Benefits?
A. Somewhat.
Q. Have you heard of it? Are you familiar with the concept of assigning insurance benefits to like the contractor?
A. Sure, yes.
Q. Have you ever done that?
A. No.
Q. I feel at this point in Florida everybody has heard the term assignment of benefits and

Page 100

probably knows what it means.
A. Yes, but I haven't done that.
Q. I have a couple general questions here.
Sir, these are some that I know the answer, I just need you to say it. Between you and your spouse who would you say had more involvement with the claim?
A. Me.
Q. Did she have really any involvement?
A. Not really.
Q. I'm going to ask her the questions, but ---
A. She didn't.
Q. Between you and her who had more involvement with the repairs that were completed?
A. Me, but she had the final say on the vanities and the toilets and the tile.
Q. The things that you can see?
A. Right, yes.
Q. But you were -- in terms of we talked about the payments made -- I assume you handled that?
A. Yes.
Q. She did not?
A. No.
Q. In terms of involvement with State Farm,

Page 101

with the adjuster, the inspections, all that, that was you, not her. I think we've established that?
A. That's correct.
Q. Have you ever filed any Complaints against any other insurance company?
A. No.
Q. So we've talked a couple different times about either photographs or e-mails relating to the claim.
Have you conducted any kind of a search to find any of those, to identify whether you have any photographs showing the damage or the water or any e-mails ---
A. I wouldn't even know where to begin.
Q. The tbarbato@aol, have you searched that for claim-related information?
A. I get probably 1,000 to 1,500 e-mails a day on that e-mail address, so I don't pay attention to it, really, very much.
Q. Not that -- I sympathize with that many e-mails -- I'm talking about doing a search.
A. No. I haven't, no.
Q. Have you searched like for -- could you search for Bob's Plumbing in your e-mail?
A. I probably could, yes.

Page 102

Q. Could you search for Arko?
A. I'm sure there's a search engine on all e-mails, yes.
Q. I assume so too, yes.
Have you done that?
A. No.
Q. I know you said you've gone through various phones since then, as probably, most people have.
Is there any kind of cloud storage thing that you use for photos?
A. No.
Q. When you switch phones you port the photos over?
A. I don't know. I go to AT&T or Apple store and, you know. I know that one of the times I lost everything on my phone, contacts and all.
Q. Do you know how far back your photos go?
A. No.
Q. Do you think you have any photos going back to 2018?
A. I don't know.
Q. Do you have like a photos app or something?
A. No, just a camera on the phone.
Q. Sir, how did you come to be a proposed class representative in this case?

Page 103

A. I asked Mike Knecht about ---
Q. Be careful.
MR. KELLOGG: I just want to counsel you, talking to, asking your attorney, him telling you, that I'm instructing you not to answer the question on. If you can't answer the question without revealing attorney-client privilege, then don't answer the question. If there is a way to answer it without revealing attorney-client communications, then you can answer the question.
A. I just thought based on the policy that there was interest due and looked into it on the policy and spoke to Mr. Knecht about it.
Q. (By Mr. Allbright) So you read at least a portion of the policy?
A. Yes, way back.
Q. Way back like ---
A. When the case was going on.
Q. Like when?
A. I don't know, probably about halfway through it because it was taking so long. I wanted to see if there was any, you know, interest due or anything of that nature because of the delay of payment or the delay of the case, I should say.
Q. So this was even before -- this was before

Page 104

even the appraisal process?
A. Yes. My first time looking into it, yes.
Q. And of your -- not anything you had with your attorney -- of your own accord you looked into it, you looked at your policy?
A. Yes.
Q. And what conclusion did you reach?
A. I didn't reach the conclusion. I saw a thing on there that said about delay of payment and that's when I asked the attorney about it.
Q. Did anyone approach you concerning --- Strike that.
So when to you did the concept of a class action come up?
A. I don't recall exactly when.
Q. Prior to you being involved in the claim, prior to you having this claim had you ever heard of a class action?
A. Like in general?
Q. Yes.
A. Yes.
Q. Be careful in your answer. Have you discussed serving as a class representative with anyone?
MR. KELLOGG: To the extent that question

Page 105

includes conversations with your lawyers I instruct you not to answer about that. If there are others other than your lawyer who you discussed ---
MR. ALLBRIGHT: It's just a yes or no question.
MR. KELLOGG: Say it again then.
Q. (By Mr. Allbright) Have you discussed your serving as a class representative with anyone?
MR. KELLOGG: Without saying who you discussed it with you can answer the question.
A. Yes.
Q. (By Mr. Allbright) With who?
MR. KELLOGG: Now we are getting into --- You can answer the question if you spoke with people who are not your attorneys about it, you can answer. If the question requires you to divulge attorney-client communications, then I instruct you not to answer.
MR. ALLBRIGHT: I'm just asking him names. Names are not privileged.
MR. KELLOGG: Okay, that's fine with that caveat. I'm reading your questions broader, but go ahead.
A. To my wife.
Q. (By Mr. Allbright) I understand your wife.

Page 106

A. I only talked to her about it recently.
Q. You're allowed to answer and he's not telling you not to answer the names.
MR. KELLOGG: The question is who did you speak with about a class action, about filing a class action?
MR. ALLBRIGHT: About serving as a class rep.
MR. KELLOGG: To the extent you spoke with your lawyers you can identify the names of the lawyers without saying what you spoke about.
MR. ALLBRIGHT: It's a narrow question and I am asking it so you don't go straying off into your actual discussions.
A. It was just to Jason and Mike Knecht.
Q. (By Mr. Allbright) When did you first have those conversations?
A. It was a while back. I don't know the exact date. It was a while ago.
Q. Was the appraisal process still going on?
A. No.
Q. Had you received a check at that point?
A. I don't recall if it was between that or after when we got the check. I think it was after we got the check.

Page 107

Q. And why did you want to serve as a class rep?
A. I just felt that if it was something that was being done across the board where folks were -- other insureds were due interest based on their policies that, you know, they don't know about it. They should be -- the policy should be paid or the interest should be paid as it's written out on the policy.
Q. So what does being a class representative mean to you?
A. I'm representing the class and assisting others.
Q. And how is that different from an individual lawsuit?
A. There's other people involved.
Q. Do you expect to be paid anything extra for being a class representative?
A. Not at all.
Q. And so what is the class of people that you think you want to represent?
A. The other insureds.
Q. Other State Farm ---
A. Or anyone. This is State Farm, yes.
Q. You are not suing anybody else.

Page 108

What duties do you believe you have to the Court as a class representative?
A. To represent the class, just to be there and answer the questions.
Q. What duties do you believe you have to other potential class members?
A. To represent them and assist them in getting what's due to them.
Q. Are you aware of any other State Farm insureds that are in a similar situation?
MR. KELLOGG: Object to the form. You can answer.
A. Directly, no.
Q. (By Mr. Allbright) Indirectly?
A. No. Other than what we're doing, no. I don't know anybody, no.
Q. You don't know Jane Smith in Opa-Locka, nothing like that?
A. No.
Q. Any idea how many members may be in the class that you're looking to represent?
A. No.
Q. What kind of relief are you seeking for the class?
MR. KELLOGG: Object to the form. You can

Page 109

answer.
A. The interest owed.
Q. (By Mr. Allbright) Money. Right?
A. Yes, sir.
Q. Any other damages that are being sought?
A. None that I'm aware of.
Q. Me neither. Just making sure. You, personally, how much are you seeking to recover? What do you feel is owed to you?
A. I believe that the interest is somewhere in the $40,000 range that is owed to us.
Q. I know you produced a spreadsheet for it, but basically the calculation is --- I believe I'm stating undisputed fact.
Your position is that the check that you received earlier that we marked as Exhibit 7 should have included interest on it?
A. Yes.
Q. And that amount also is subsequently bearing interest getting you to that estimated $40,000 number, wherever we are sitting here today?
A. Correct.
Q. And how much interest should have been included with that check?
A. I'm not sure right now.

Page 110

MR. KELLOGG: Let's go off the record.
THE VIDEOGRAPHER: We are going off the record. The time is 12:26.
(Off the record.)
THE VIDEOGRAPHER: It is 12:26 and we are back on the record.
MR. ALLBRIGHT: Let the record reflect that Mrs. Barbato has joined us.
Welcome, ma'am.
MRS. BARBATO: Thank you.
Q. (By Mr. Allbright) Sir, I believe the number -- the interest amount that you are claiming should have been paid at that time was $31,358?
A. Approximately, yes.
Q. Are there any documents that reflect you serving as a class representative other than the Complaint?
A. No.
Q. Did you sign any written agreements regarding this case with any of the attorneys?
A. Yes.
Q. What are the law firms representing you in this case?
A. It's Mr. Kellogg, Knecht and Rodriguez. I forget who else is on there. Where we are. They're

Page 111

not here yet, though. They're moving in.
Q. Their name might not even be on the wall yet.
A. Alex had a problem finding it this morning.
Q. Sir, have you paid anything to your attorneys for this case so far in terms of fees or expenses?
A. No.
Q. What is your understanding of responsibility, if any, for fees and expenses?
A. For me to pay them?
Q. Yes.
A. It's contingent.
MR. ALLBRIGHT: I am going to go through some of the confidential documents now, just so the record is clear. The first one is Barbato 130 dated October 21, 2022.
MR. KELLOGG: This is going to be Exhibit 11?
MR. ALLBRIGHT: Yes, sir.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 11.)
Q. (By Mr. Allbright) Sir, take a look at Exhibit 11. Do you recognize the document?

Page 112

A. Yes.
Q. Is your signature on there?
A. Yes.
Q. And that covers among other things the contingency and the costs?
A. Correct.
Q. Does it say on there when you signed it?
A. My signature is not dated. The letter is dated October 21st of '22.
Q. Does that sound about when you probably signed it?
A. Correct, yes.
Q. Did you read it before signing it?
A. Yes.
Q. Did you have a chance to ask any questions about it?
A. Yes.
Q. Who was with you when you signed it?
A. I signed it initially and then brought it to my wife for her signature.
Q. Did you request any changes to it before you signed it?
A. No.
Q. Did you understand all of it?
A. Yes.

Page 113

Q. How did you initially come to employ attorney Knecht and the Knecht Law Group?
A. In this or the original?
Q. Whenever you first --- When did you first know that he was a person?
A. His brother is my neighbor, so I knew him. I have known the brother for quite a while.
Q. How long has he been your neighbor?
A. Since I moved into the house. It's not Steve, the one Chris.
Q. Right, Chris is your neighbor?
A. Yes.
Q. And Michael is the one representing you?
A. Correct.
Q. And I think Stephen is also a lawyer?
A. Correct.
Q. So is it fair to say that when you realized you were having a dispute that was who you were going to go with?
A. Correct.
Q. So you had met Michael Knecht well in advance, more than a decade ago, probably?
A. Oh, yes.
Q. Prior to the claim had you ever had need for his legal services?

Page 114

A. No.
Q. So that was the first time?
A. Yes.
Q. Once the class action case was filed how many meetings have you had with Michael Knecht or anyone else at Knecht Law Group?
MR. KELLOGG: Object to form. You can answer.
A. Just a handful of times.
Q. (By Mr. Allbright) Five or fewer?
A. Fewer than five.
Q. And to be clear, I was not talking about the 2019 through 2022 process.
A. Correct.
Q. Because I'm sure that may have been different --
A. Yes.
Q. -- and I'm not asking about that.
And of those handful of meetings, how long were they?
A. Brief, 10, 15 minutes.
Q. Were those in person, phone, Zoom?
A. On the phone.
Q. During those calls was anyone else on those calls?

Page 115

A. No, not that I'm aware of, no.
Q. Anyone else at Knecht Law Group that you spoke with other than Michael?
A. I think her name his Susan, his secretary, paralegal.
Q. I know the name is somewhere.
Again, a direct question, a direct yes or no question, not substance. Have you seen any written reports about the class action case from Michael Knecht?
MR. KELLOGG: Object to the form. You can answer if you can.
A. Only the Complaint.
Q. (By Mr. Allbright) Okay, that's fine. If that's it, that's it.
I wasn't even referring to the Complaint. I was referring to like a memo or a status or something. Again, I'm not asking for the substance.
A. Right. No.
MR. ALLBRIGHT: This will be Exhibit 12. Barbato 153, this is also confidential.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 12.)
Q. (By Mr. Allbright) Take a look at that,

Page 116

please.
Do you recognize the document, sir?
A. Yes.
Q. Does that document bear your signature?
A. Yes.
Q. Does it say when you signed it?
A. It's dated 9-12-18.
Q. Is that your dating?
A. That's not my handwriting, no.
Q. But the date seems about right?
A. I would assume so, yes.
Q. Did you read it before signing?
A. I'm sure I did.
Q. Was anyone else present with you when you did that?
A. No. I signed it and then brought it to my wife to sign.
Q. Do you understand the document?
A. Yes.
Q. Are there any parts of it you didn't understand?
A. No.
Q. Did you request any changes to it before signing?
A. No.

Page 117

Q. Are there any other documents, or agreements, rather, any other agreements between you and attorney Knecht's office?
A. There were several agreements that I had signed with different firms, but I believe this is the only one with the Knecht Group.
MR. ALLBRIGHT: The next one here, I think one of those documents you're referring to, Barbato 161, also confidential.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 13.)
Q. (By Mr. Allbright) Do you recognize that, sir?
A. Yes.
Q. Is that one of the other documents you were thinking of?
A. Yes.
Q. And that has your signature on it?
A. Yes.
Q. And the date for your signature?
A. It's typed in at 4-14-20.
Q. Does that seem accurate to you?
A. Yes.
Q. That is a three-page document. Yes?

Page 118

A. Yes.
Q. Did you read it before signing?
A. Yes.
Q. Was anyone present with you when you did that?
A. I signed it and brought it to my wife for her signature.
Q. And all of this was done at your house?
A. Yes.
Q. Did you understand the document?
A. Yes.
Q. Were there any parts you didn't understand?
A. No.
Q. Did you request any changes?
A. No.
Q. And that document, I believe, was to bring in the Rodriguez Tramont & Nunez firm. Correct?
A. Yes.
MR. ALLBRIGHT: This will be 14.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 14.)
Q. (By Mr. Allbright) Take a look at that.
A. Okay.
Q. Do you recognize the document, sir?

Page 119

A. Yes.
Q. Does it have your signature?
A. Yes, it does.
Q. When did you sign it or when does it say you signed it?
A. July 19th of '23.
Q. Does that sound about right to you?
A. Yes.
Q. You have the contract. I didn't pull out my copy. I don't know if you wrote in the date or it is printed.
A. It's a fill-in-the-blank. It has July typed and then 19th handwritten, 2023.
Q. Did you read it before signing?
A. Yes, sir.
Q. Was anyone else with you at the time?
A. I signed it and brought it to my wife to sign.
Q. Do you understand the document?
A. Yes, sir.
Q. Are there any parts that you didn't understand?
A. No, sir.
Q. Did you make any changes or request any changes?

Page 120

A. No, sir.
MR. ALLBRIGHT: Counsel, I don't believe there was a separate retainer for Levine Kellogg.
MR. KELLOGG: It was within that document, that was my retainer.
MR. ALLBRIGHT: The one with the three letterheads?
MR. KELLOGG: Yes.
MR. ALLBRIGHT: That's what I thought. I just wanted to make sure.
Q. (By Mr. Allbright) Regarding the Rodriguez Tramont & Nunez firm, how many meetings --- Strike that.
They represented you during the state court case as well. Correct?
A. Yes.
Q. So for purposes of the class action case, how many meetings have you had with attorneys from that firm?
MR. KELLOGG: Object to form. You can answer.
A. None.
Q. (By Mr. Allbright) None?
A. None.
Q. Any phone calls?

Page 121

A. Not that I can recall, no.
Q. Do you know the names of any of the attorneys at that firm?
A. No.
Q. Have you received any reports from that firm about the status of the case?
A. No.
Q. Prior to their engagement as reflected in the exhibit you reviewed did you have any personal or business relationship with the firm?
A. No.
Q. Is there any other relationship between you and the Rodriguez Tramont Nunez firm?
A. Not to the best of my knowledge, no.
Q. And there's no other agreements or documents with that firm?
A. Not that I'm aware of, no.
Q. As far as you can tell, the documents that we've just gone through, Exhibits 11, 12, 13 and 14, is there any other document that you think is out there that we're missing --
A. Not that I can think of, no.
Q. -- related to the case?
A. No, not that I can think of.
Q. Okay, perfect.

Page 122

So you first employed the Levine Kellogg firm October of 2022 based on the exhibit. Is that accurate?
A. I believe so, yes.
Q. Since that time how many meetings have you had with attorneys at that law firm?
MR. KELLOGG: Object to the form. You can answer.
A. Four or five.
Q. (By Mr. Allbright) And how long were those meetings?
A. Phone calls, you know, 10, 15 minutes. We had a meeting that was probably an hour, hour and-a-half, maybe, and then the Zoom.
Q. Right, I know you met for the depo, but besides that?
A. Oh, before that it was phone calls, probably three or four phone calls.
Q. Anyone other than Mr. Kellogg?
A. No.
Q. Have you seen any written reports about this case from Mr. Kellogg or his office?
MR. KELLOGG: Object to the form. You can answer.
A. No, not that I can recall.

Page 123

Q. (By Mr. Allbright) Prior to October, 2022, did you have any prior personal or business relationship with Mr. Kellogg's firm or Mr. Kellogg?
A. Not to the best of my knowledge, no.
Q. Aside from this case is there any other relationship between you and Mr. Kellogg or his firm?
A. No.
Q. And there's no other -- there's no other written agreement, like you said, between you and his firm specifically, just the one document that we looked at?
A. Correct.
Q. Do you know when the --- Strike that.
Do you know when this class action lawsuit was filed?
A. I believe it was October. Was that the date? I'm not sure of the exact date.
MR. KELLOGG: Just to the best of your recollection.
A. '22, fall of '22, winter of '22.
Q. Sir, were you aware that there was ---
Strike that.
MR. ALLBRIGHT: The next exhibit is 15.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit

Page 124

No. 15.)
Q. (By Mr. Allbright) Sir, this is Document 1 in the Federal Court Record for this case, the Complaint without attachments to save trees.
Have you seen that document before, sir?
A. No.
Q. So that reflects the case filing on September 9, 2022. Do you see that at the top?
A. Yes.
Q. And you can also probably flip to the last page, potentially, and also see that date?
A. Yes, that date, September 9th.
Q. And you are not listed on that. Are you on that document?
A. I don't see my name, no.
Q. Whose name do you see?
A. Sandra Safont.
Q. Do you know Ms. Safont?
A. No.
Q. Have you ever heard of her?
A. No.
Q. Are you aware of a lawsuit called Aymee Taylor vs. State Farm that is in Duval County, Florida?
A. No.

Page 125

Q. So the document you have, Exhibit 15, it says "Complaint." Right?
A. "Complaint and Demand For Jury Trial."
MR. ALLBRIGHT: I am going to show you Exhibit 16. This is also without exhibits.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 16.)
Q. (By Mr. Allbright) Have you ever seen that before, sir?
A. Yes.
Q. Is your name on that document?
A. Yes.
Q. That one is Amended Complaint, November 8, 2022. Do you see that?
A. Yes.
Q. Do you know why the Complaint was amended?
MR. KELLOGG: I am going to instruct you not to reveal any attorney-client privileged communications in response to this question. If you can answer it without revealing communications with your lawyer, then you can go ahead and answer.
A. Ask it again, please.
Q. (By Mr. Allbright) Do you know why the Complaint was amended to add you and your wife?

Page 126

MR. KELLOGG: Same objection, go ahead.
A. No.
Q. (By Mr. Allbright) Sir, are you familiar with Florida Statute 627.70152?
A. No.
Q. Are you aware whether you filed or was filed on your behalf a Notice pursuant to that statute?
MR. KELLOGG: Object to form.
A. I don't know what the statute is, so I don't know.
Q. (By Mr. Allbright) Do you know what relief is being sought in the Amended Complaint?
MR. KELLOGG: Objection. I think that was asked and answered, but go ahead.
A. Repeat your question again.
Q. (By Mr. Allbright) What relief was being sought in the Amended Complaint?
A. I have to add time to my parking meter. Sorry, can we do that?
MR. ALLBRIGHT: You can do it. We don't need to go off. Just do it.
(Crosstalk about the parking.)
THE VIDEOGRAPHER: We are going off the video record. The time is 1:00.

Page 127

(Off the record.)
THE VIDEOGRAPHER: We are back on the video record. The time is 1:02 and this is Media No. 4.
Q. (By Mr. Allbright) Do you know what relief is sought in the Amended Complaint?
A. I don't understand what you mean by "relief."
Q. What are you seeking, what is being sought?
A. The interest that's owed.
Q. Anything that is in the original Complaint that is not in the Amended Complaint, to your knowledge?
MR. KELLOGG: Object to the form. You can answer.
A. Not that I'm aware of.
Q. (By Mr. Allbright) Did you see the Amended Complaint before it was filed? It's the one that has your name on it.
A. The one that you just gave me?
Q. Yes.
A. That is 16?
Q. Yes.
A. I don't believe so, no.
Oh, I might have. I'm not sure.
Q. If you're not sure, you're not sure.

Page 128

A. I'm not sure.
Q. Do you know if that Complaint was amended?
A. I saw the third one, so I'm assuming that one was.
MR. ALLBRIGHT: Fair deduction.
Before we get to the third we need to go with the second. It also does not have the attachments to it.
This is going to be Exhibit 17.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 17.)
Q. (By Mr. Allbright) So you now have the Second Amended Complaint filed September 8th of 2023. Right?
A. Yes.
Q. Do you know why this Complaint was amended from the prior?
A. I'm not sure.
Q. Is there any difference in the relief sought versus the Amended Complaint?
A. Not that I'm aware of.
Q. Is there anything in the Second Amended Complaint that was --- Strike that.
Do you know what was in the Amended

Page 129

Complaint, but was not in the Second Amended Complaint?
A. No. I'm not sure. I don't think so.
Q. Did you see the Second Amended Complaint before it was filed?
A. I don't think so.
MR. ALLBRIGHT: And you obviously are aware of the Third Amended Complaint, which is the current one. So I did go ahead and include the attachments to that. That will be Exhibit 18.
(Thereupon, the document referred to was marked for identification as Defendant's Exhibit No. 18.)
Q. (By Mr. Allbright) So you're somewhat familiar with --
A. Yes, I've seen it.
Q. -- the Third Amended Complaint. As we discussed earlier you brought a copy.
Do you know why the Complaint was amended from Second to Third?
A. No, not -- I mean ---
Not that I recall.
Q. Did you review the Third Amended Complaint before it was filed?
A. Before it was filed? I don't recall if I

did or not.
Q. I understand it can be tricky when we have Amended Complaint, Amended Complaint Second, Amended Complaint Third.
Do you recall reviewing any Complaint prior to it being filed? That may be an easier phrasing.
A. Before being filed?
Q. Before being filed.
A. I don't know. I don't recall if I saw them before they were filed.
Q. Do you remember ever commenting on a draft of a Complaint?
A. No.
Q. Do you know if State Farm has responded to the Third Amended Complaint?
MR. KELLOGG: Object to the form. Go ahead.
A. I do not know.
Q. (By Mr. Allbright) Do you know whether State Farm has any defenses to the Third Amended Complaint?
MR. KELLOGG: Same objection.
A. I do not know.
Q. (By Mr. Allbright) I think you said this before, but just to confirm, you don't have a name,



contact or identifying information of anyone else that you think is in the class?
A. No.
Q. Have you seen any documents identifying or showing a list of people who might be in the class?
A. No.
Q. Have you as Plaintiffs put forth any experts yet in this case?
A. No.
MR. ALLBRIGHT: Just give me a minute, please.
Sir, at this point I don't have any further questions for you. As stated earlier, State Farm reserves the right to take a continued deposition if circumstances so warrant. Counsel's anticipated objection is noted if that comes to pass. We already talked that you would read, that he would read. Right?
MR. KELLOGG: Yes, he'll read.
I just have a couple follow-up questions.

CROSS-EXAMINATION

MR. KELLOGG:
Q. Mr. Barbato, you testified earlier that your damages, your interest calculation, was about $40,000. Do you recall that?



A. Yes.
Q. Did you calculate that number?
A. No.
Q. Do you know who calculated that number?
A. No.
Q. You also testified earlier that you or your wife and maybe your son were present when the event happened in May of 2018 that caused the flood, the event. Do you remember that?
A. Yes.
Q. Were you there when it happened?
A. Yes.
Q. Who else was there?
A. My wife and I believe my son was there.
MR. KELLOGG: No further questions.
MR. ALLBRIGHT: Nothing.
THE VIDEOGRAPHER: We are going off the video record. The time is 1:13 p.m.
(Thereupon, the taking of the deposition was concluded at 1:13 p.m.)



CERTIFICATE

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, JoD. Soffer-Olson, a Notary Public in and for the State of Florida at Large, do hereby certify that, pursuant to a Notice of Taking Deposition in the above-entitled cause, THOMAS BARBATO was by me first duly cautioned and sworn to testify the whole truth, and upon being carefully examined testified as is hereinabove shown, and the testimony of said witness was reduced to typewriting under my personal supervision and that the said deposition constitutes a true record of the testimony given by the witness.

I further certify that the said deposition was taken at the time and place specified hereinabove and that I am neither of counsel nor solicitor to either of the parties in said suit nor interested in the event of the cause.

WITNESS my hand and official seal in the City of Miami, County of Dade, State of Florida, this 4th day of December, 2025.

JoD. Soffer-Olson
JoD. Soffer-Olson.
Florida Notary
Comm. FF158527
Expiration: 9/9/26

Jason Kenneth Kellogg, Esq.
Levine Kellogg Lehman Schneider & Grossman
Jk@lklsg.com
December 4, 2025
Re: Safont, et al. vs. State Farm.
11-13-25 Thomas Barbato Job No. 7740553

The above-referenced transcript is available for review. Thomas Barbato should read the testimony to verify its accuracy. If there are any changes, Mr. Barbato should note those with the reason on the attached Errata Sheet.

Mr. Barbato should, please, date and sign the Errata Sheet and e-mail to the deposing attorneys as well as to Veritext at Transcripts-fl@veritext.com and copies will be e-mailed to all ordering parties.

It is suggested that the completed Errata be returned 30 days from receipt of testimony, as considered reasonable under Federal Rules*. However, there is no Florida Statute in this regard.

If Mr. Barbato fails to do so, the transcript may be used as if signed.

Kindly,

Veritext Legal Solutions

* Federal Civil Procedure Rule 30(e), Florida Civil Procedure. Rule 1.301(e).



ERRATA SHEET

IN RE: Sandra Safont, et al. vs. State Farm
WITNESS: Tom Barbato
DATE TAKEN: 11-13-25
Job No. FLA7740553

Page No. Line No. Change: Reason:

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

Under penalty of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_______________ ___________________
Date Witness Name

**&**

**&** 2:2 3:3,16,17 3:19,21,22 118:17 120:12 134:1

**1**

**1** 2:19 9:12,13 21:22,25 22:4 30:6 66:19 71:15 79:15 88:13,13 89:13 89:14 91:6 92:9 92:18 98:6 124:2
**1,000** 101:17
**1,500** 101:17
**1.301** 134:18
**10** 3:10 12:2 98:1,4 114:21 122:12
**10-10-22** 84:8
**10-20-22** 3:6
**10-21-22** 3:12
**100** 2:3 97:15
**1099** 12:6
**10:01** 44:21
**11** 3:11 111:19 111:23,25 121:19
**11-13-25** 134:4 135:3
**11-7-18** 2:22
**111** 3:11
**113** 69:16
**115** 3:13
**117** 3:14
**118** 3:16
**11:18** 87:13
**11:39** 87:16
**12** 3:13 23:18 68:18 115:20,24 121:19
**123** 3:17
**125** 3:19
**125,456.02** 3:5
**126** 84:15
**128** 3:20
**129** 3:22
**12:26** 110:3,5
**13** 1:14 3:14 23:8 117:12 121:19
**130** 2:16 111:16
**136** 21:17
**13th** 4:5 47:11
**14** 3:16 14:10,14 14:15,17,20 118:19,22 121:19
**142nd** 11:8
**15** 3:17 10:22 12:2,4 15:14 23:8 114:21 122:12 123:23 124:1 125:1
**153** 115:21
**16** 3:19 125:5,8 127:21
**161** 117:9
**162** 9:11,12
**168** 55:2
**17** 3:20 128:9,12
**17247** 133:21
**178** 9:12,13
**18** 3:22 129:10 129:13
**1958** 95:15
**1967** 10:7
**1989** 10:22
**19th** 119:6,13
**1:00** 126:25
**1:02** 127:3
**1:13** 132:18,20
**1:22** 1:2
**1st** 82:3,15,21 83:9

**2**

**2** 2:20 30:19,22 34:6,7 44:22 54:7,10 96:10
**2,800** 21:12
**2,900** 21:12
**2.5** 23:7
**20** 15:12
**2010** 13:6,7
**2011** 24:12
**2014** 24:13,14
**2017** 19:14,20 29:3
**2018** 13:14,18 13:20 17:24 18:1 19:6 27:22 28:7,9 29:19,20 35:18 37:12 45:12 50:24 62:13 64:25 99:13 102:20 132:8
**2019** 68:18 86:6 114:13
**2021** 98:25
**2022** 86:10 87:22 111:17 114:13 122:2 123:1 124:8 125:15
**2023** 119:13 128:14
**2025** 1:14 4:5 19:12 133:15 134:3
**2032** 80:12
**21** 2:19 111:17
**2100** 1:13
**21st** 112:9
**22** 80:11 112:9 123:20,20,20
**22891** 1:2
**23** 11:11 119:6
**24** 11:11 94:9,10

**25** 96:23
**25th** 50:24
**26** 10:7
**28th** 64:12

**3**

**3** 2:22 62:7,10 62:11 69:14,15 87:16 89:10,11
**3'2** 35:1
**30** 15:12 69:10 79:9 134:11,18
**31** 27:21 35:18
**31,358** 110:13
**31st** 55:14
**32** 80:9,10
**33131** 2:4,7
**33158** 11:9
**36th** 2:3
**37,395** 69:17

**4**

**4** 2:15,23 71:2,5 127:3 134:3
**4-14-20** 3:15 117:22
**40,000** 109:11 109:21 131:25
**4th** 133:15

**5**

**5** 2:24 55:1 71:17,21
**5'4** 35:1
**54** 2:20

**6**

**6** 3:3 78:22 79:2 81:20
**62** 2:22
**627.70152** 126:4

**7**

**7** 3:5 45:12 62:12 83:20,23 83:24 86:10 109:16
**70** 97:10,11
**70,000** 97:11
**71** 2:23,24
**7740553** 134:4
**79** 3:3
**7:00** 36:6,10

**8**

**8** 3:6 84:9,12,14 125:14
**8-28-18** 63:24
**8-31-22** 80:5
**8025** 11:8
**81** 79:16
**8205** 21:1
**83** 3:5
**84** 3:6
**86** 3:8
**87th** 93:18
**8:30** 27:14
**8:52** 1:14 4:6
**8th** 128:14

**9**

**9** 3:8 86:16,19 124:8
**9-1** 80:8
**9-1-32** 80:14
**9-12-18** 116:7
**9/9/26** 133:23
**90** 25:9
**98** 2:7 3:10
**9:52** 44:18
**9th** 124:12

**a**

**a.m.** 1:14 4:6 44:21
**abandoned** 88:20 89:3,8 90:15 91:8,16
**ability** 11:16,19
**able** 58:14 60:14 88:19
**above** 34:23 35:6 133:7 134:5
**ac** 21:12
**access** 37:18 77:13
**accommodating** 8:15
**accompanied** 7:9 84:25
**accord** 104:4
**account** 60:16
**accounts** 13:16 60:13,20
**accuracy** 134:6
**accurate** 22:7 55:18 117:23 122:3
**action** 16:18,22 71:16 72:2 104:14,18 106:5 106:6 114:4 115:9 120:17 123:14
**active** 22:25
**actual** 67:12 106:14
**actually** 17:12 34:20 93:19
**add** 125:25 126:19
**added** 28:22
**additional** 72:6
**address** 11:7 12:15,17 13:8 101:18
**adjacent** 88:23
**adjoining** 32:14
**adjuster** 47:17 47:19 48:3 51:20 56:20,22 56:24 57:4,6 61:2 101:1
**adjusters** 59:12

**adjustment** 50:4
**advance** 113:22
**advice** 17:19
**affect** 11:15,19
**agent** 12:4 26:23 27:2
**ago** 5:16 23:5,8 23:17,18 36:4 40:19 43:5,11 55:22 93:3,16 94:8 106:19 113:22
**agree** 80:11 82:2
**agreement** 3:13 3:16 12:7 58:6 70:10 123:9
**agreements** 110:19 117:2,2 117:4 121:15
**ahead** 105:23 125:22 126:1,15 129:9 130:17
**akerman** 2:6 4:25
**akerman.com** 2:8
**al** 4:4 134:4 135:2
**albright** 44:23
**alex** 2:10 111:4
**allbright** 2:6,15 4:10,10,19,24 8:21,24 9:7,14 9:20 10:25 14:19 15:24 17:12,20 21:21 22:3 23:13 32:23 33:1,3 34:4 39:2 44:14 49:1,2 54:7,11 54:18,24 56:16 59:19 62:7,11 69:9,15,16 70:22 71:6,17 71:22 73:1,25 78:22 79:3 81:16,19 82:9 82:15,19 83:20 83:24 84:9,13 84:16,22 85:10 86:3,13,16,20 87:6,11,17 96:16,19 98:1,5 98:10,17,21,24 103:14 105:4,7 105:12,19,25 106:7,12,16 108:14 109:3 110:7,11 111:14 111:20,24 114:10 115:14 115:20,25 117:7 117:13 118:19 118:23 120:2,6 120:9,11,23 122:10 123:1,23 124:2 125:4,9 125:24 126:3,12 126:17,21 127:4 127:16 128:5,13 129:7,14 130:19 130:24 131:10 132:16
**allgright** 70:17
**allowed** 106:2
**amended** 2:24 3:19,20,22 15:25 71:18 125:14,17,25 126:13,18 127:5 127:11,16 128:2 128:14,17,21,23 128:25 129:1,4 129:8,17,19,23 130:3,3,3,15,20
**amendment** 72:4
**amount** 109:19 110:12
**andrew** 18:10 18:12,13
**android** 37:24
**annoying** 42:5
**answer** 7:1,15 7:16,18 12:22 31:2 56:12 69:7 70:13 72:25 82:5,12 85:5 87:4 100:4 103:5,6,8,8,10 104:22 105:2,10 105:14,15,18 106:2,3 108:4 108:12 109:1 114:8 115:12 120:21 122:8,24 125:21,22 127:14
**answered** 126:15
**answering** 7:23
**answers** 8:8
**anticipated** 131:15
**anybody** 42:24 43:2 67:20 107:25 108:16
**anymore** 13:19
**aol** 101:15
**aol.com.** 13:9
**app** 102:22
**appeal** 72:21 73:2,4,7 74:5
**appealing** 94:20
**appeals** 16:16 72:23
**appearance** 4:8 52:4
**appearances** 2:1
**appears** 83:24 84:2
**apple** 102:14
**appraisal** 3:3 58:24 59:8 70:1 70:4,5,11 72:16

72:17,19 73:10 73:16,20 74:3,8 74:13 75:4,6,22 78:18,23 79:4 81:9,20 83:13 84:1 85:23 104:1 106:20
**appraisals** 23:4
**appraiser** 56:25 57:3,7 81:24
**appraisers** 76:20 78:5,7,11
**approach** 104:11
**approximately** 56:5 110:14
**april** 10:22 98:25
**area** 91:13
**arko** 62:22,25 63:1,22 65:2 66:20,24 67:15 69:5 94:14 102:1
**arranged** 74:14
**arrested** 6:12
**arrived** 51:21
**artau** 1:2
**aside** 14:3 123:5
**asked** 38:9 76:4 76:4 98:20 103:1 104:10 126:15
**asking** 83:6,7,9 103:4 105:19 106:13 114:18 115:18
**asks** 97:6
**asserted** 98:13
**assigning** 99:19
**assignment** 99:16,25
**assist** 108:7
**assistant** 65:20
**assisting** 107:12
**association** 12:21
**associations** 12:20
**assume** 7:19 8:21 23:5 50:2,3 52:15,22 53:22 56:6,8 60:2 61:7 61:11 66:1,14 67:9 75:24 76:10,11 79:13 80:17 85:21 89:21 92:17 94:18 100:21 102:4 116:11
**assuming** 19:16 19:17 60:9 80:22 82:21 88:22 128:3
**at&t** 102:14
**attached** 62:20 67:8 79:8 81:17 134:7
**attachments** 3:7 54:20 124:4 128:8 129:9
**attempted** 26:6
**attention** 54:25 101:18
**attorney** 9:10 83:5 85:2,19 103:4,7,9 104:4 104:10 105:17 113:2 117:3 125:19
**attorneys** 2:5,8 63:5 70:16 73:13,19,22 86:8 105:15 110:20 111:6 120:18 121:3 122:6 134:9
**august** 64:12,25
**auslander** 3:16
**authenticity** 9:22
**authorize** 87:2
**available** 134:5
**ave** 93:18
**award** 3:3 78:23 79:4 80:20,20 81:6,10,20 83:13 84:1
**aware** 25:25 44:5 70:17 108:9 109:6 115:1 121:17 123:21 124:22 126:6 127:15 128:22 129:7
**aymee** 124:22

**b**

**b** 94:2
**back** 13:22 18:11,17 19:9 24:19 26:8,15 41:9 42:14,21 44:2,20 60:11 60:13 71:11 76:12,22 87:15 87:17 96:12 102:17,19 103:16,17 106:18 110:6 127:2
**backed** 30:24 31:6,12
**background** 48:20
**backup** 30:2 32:6,10,13 33:17
**backups** 31:4 41:13
**bank** 5:13,14 23:22
**bar** 34:20,22
**barbato** 1:4,5 1:22 2:10,15,19

2:22 3:5,15 4:3 4:13,15 5:5 9:12 9:13,17 10:20 21:17 55:10 69:16 79:16 84:15 93:5 98:5 110:8,10 111:16 115:21 117:8 131:23 133:7 134:4,6,7,8,13 135:2
**barbato.t** 13:12
**barbatos** 9:24 9:25
**based** 16:25 31:16 50:23 66:19,22 69:4 72:15 73:19 81:7 82:1 85:22 90:13 103:11 107:5 122:2
**basically** 89:16 109:13
**basics** 6:7
**basis** 73:7
**bat** 35:4
**bates** 9:11 54:11 55:2,3 79:16 84:14
**bath** 30:9,13 32:15 34:5 41:6 88:17,20,23 91:13 92:1,9,18
**bathroom** 30:3 30:15 31:13 32:11 34:5 39:4 40:13,17 41:12 42:16 43:13 56:1,7 88:18 89:7,9,20 91:19 91:24 92:4,8 94:5,11 96:1,6
**bathrooms** 28:15,15,19 30:4 49:5 53:8 88:4,11 92:5,12 92:14 94:7 95:24,25 97:5
**bathtub** 30:2,9 31:13,20 32:4 36:25 38:25 40:8,21 42:17 56:9
**bathtubs** 30:7,7 30:25
**battle** 40:9
**bay** 11:9 31:25 32:1,1 33:11 43:7 64:6,9 95:8
**bear** 51:20 116:4
**bearing** 109:20
**bedroom** 22:12 30:19,22 34:6,7 34:14 42:16 88:18 89:10,11 89:13,14 91:6 92:9,18 96:10
**bedrooms** 22:9 22:10 30:16,20 49:5
**behalf** 1:5,23 4:10,12 126:7
**believe** 9:8,17 17:9 19:8,20 20:4 54:21 57:10,21 63:1 64:7 73:9 83:18 84:3 90:18,19 99:6 108:1,5 109:10,13 110:11 117:5 118:16 120:2 122:4 123:16 127:23 132:14
**bell** 78:14
**benefits** 99:16 99:19,25
**berkshire** 12:10
**bert** 94:2
**best** 41:24 51:10 53:6 57:24 75:2 97:4 121:14 123:4,18
**better** 10:24 36:23 38:13 94:11
**bidet** 91:23,25
**big** 25:17,19
**birth** 10:6
**bitcoin** 97:11
**blank** 119:12
**blind** 35:4
**blue** 90:16 91:11,12
**blvd** 1:13
**board** 107:4
**bob** 75:14 93:10 95:7,13,14 97:17
**bob's** 31:24 33:11 43:7 64:6 64:7 93:7,10,22 94:13,23 95:10 95:12,15 97:19 101:24
**bobs** 75:20
**born** 10:8,15
**bottom** 29:13
**bought** 20:21 22:16 24:3 26:12 28:11 94:24 95:2
**boy** 11:5 40:1
**breach** 71:16
**break** 8:11,12 44:13,15 45:4 87:11 92:3
**bridge** 9:4
**brief** 12:1 114:21
**briefly** 14:6 34:4

**bring** 16:5 118:16
**broader** 105:22
**brokerage** 12:7
**brother** 113:6,7
**brought** 70:11 112:19 116:16 118:6 119:17 129:18
**brown** 37:2
**bullet** 55:13
**business** 12:15 12:17 25:10 77:14 121:10 123:2
**businesses** 25:5
**buy** 97:8,9
**buying** 26:5
**bye** 53:25 54:2,3

**c**

**cabinets** 19:23 29:8,12 97:1
**caboodle** 97:13
**calculate** 132:2
**calculated** 132:4
**calculation** 109:13 131:24
**call** 11:25 31:17 42:23,24,24 43:1,2 45:23 46:16 50:11 85:22 96:4
**called** 4:16 31:23 33:14 43:4,6 45:16,21 45:23 46:3,7,12 58:7 64:7 99:15 124:22
**calls** 15:17 62:1 62:2 114:24,25 120:25 122:12 122:17,18
**camera** 4:24 32:24 37:15 64:8 102:23
**cameras** 37:13
**card** 50:11 59:5 59:5 60:9 97:20
**cards** 60:18
**careful** 103:2 104:22
**carefully** 133:8
**carrier** 17:2
**cascading** 40:7 40:21,24
**case** 1:2 6:19 9:7 16:6 63:7 73:1,5,8,12 85:22 86:25 87:2 102:25 103:18,24 110:20,23 111:6 114:4 115:9 120:15,17 121:6 121:23 122:22 123:5 124:3,7 131:8
**cash** 59:3,4,4,5 97:18,22
**cast** 88:2,5,14 92:21
**cause** 133:7,13
**caused** 132:8
**cautioned** 133:8
**caveat** 105:22
**cellphone** 37:11
**central** 93:20
**certainly** 80:12
**certificate** 133:1
**certify** 133:6,11
**chance** 55:16 112:15
**change** 44:24 135:4
**changes** 10:4 112:21 116:23 118:14 119:24 119:25 134:6
**chase** 3:5 22:24 22:24 23:21 83:19 84:6
**check** 3:5 59:3,5 59:7 60:9,22 67:25 83:12,17 83:25 84:7,25 85:1,9,11,16 87:22 97:18,21 106:22,24,25 109:15,24
**checking** 60:15 60:20 99:6
**checks** 97:20
**children** 11:2 24:8,10
**chris** 63:14 113:10,11
**christopher** 15:1
**circumstances** 9:1 131:15
**citizens** 17:5 19:2,4,7 20:2 26:18
**city** 133:15
**civil** 134:18,18
**claim** 13:25 16:10,24 18:1 18:11,13,14 19:13,19,24,24 20:8 27:7,9,18 27:21,22 28:2 28:10 29:1,24 31:5,6,8 32:7 46:20 48:21,25 56:23 57:9 59:15 79:6 85:21 86:5 87:24 100:7 101:9,16 104:16 104:17 113:24
**claiming** 110:12
**claims** 18:3,9,20 19:17

**clarify** 44:25 87:20
**class** 6:22 16:17 16:22 102:25 104:13,18,23 105:8 106:5,5,7 107:1,10,12,18 107:20 108:2,3 108:6,21,24 110:16 114:4 115:9 120:17 123:14 131:2,5
**clean** 36:24 39:10,12
**cleaned** 39:9 40:6,11
**cleaning** 40:11 40:16
**clear** 111:16 114:12
**client** 98:11 103:7,9 105:17 125:19
**clogged** 41:22
**closed** 28:13 55:25
**closet** 30:23,23 34:6
**closets** 30:5,17 30:21,22 34:7 42:16
**cloud** 102:9
**clue** 47:6
**coach** 7:11
**college** 14:9 24:19
**columbus** 15:1
**combination** 97:19
**combine** 61:15
**combo** 43:17
**come** 7:4 8:1 24:19 28:23 33:14 43:9 44:2 44:8 46:25 76:12 81:4 102:24 104:14 113:1
**comes** 6:7 131:16
**coming** 34:11 34:12 38:24 40:3,4,6,20 41:2 46:22 50:14 53:6 62:15 65:2 65:5,8
**comm** 133:22
**commenting** 130:11
**common** 79:24
**communicate** 61:25
**communicated** 62:6
**communication** 67:15
**communicatio...** 73:22 103:9 105:17 125:20 125:21
**company** 1:9 4:5 95:11 101:5
**compel** 72:17
**complaint** 2:23 2:24 3:17,19,20 3:22 15:25,25 18:2 71:7,18 110:17 115:13 115:16 124:4 125:2,3,14,17 125:25 126:13 126:18 127:5,10 127:11,17 128:2 128:14,17,21,24 129:1,2,4,8,17 129:19,23 130:3 130:3,4,5,12,15 130:21
**complaints** 72:10 101:4
**complete** 9:16
**completed** 8:4 29:19 59:9 82:14,18 100:15 134:11
**completely** 28:12 52:14
**concept** 99:19 104:13
**concerning** 104:11
**concluded** 132:20
**conclusion** 104:7,8
**concrete** 25:21
**condition** 28:5
**conditions** 11:18
**conducted** 101:10
**confidential** 9:9 98:11 111:15 115:21 117:9
**confirm** 130:25
**consider** 25:10
**considered** 81:6 134:12
**constantly** 42:3
**constitutes** 133:10
**contact** 63:21 131:1
**contacts** 102:16
**contents** 73:21
**context** 5:12
**contingency** 3:13 112:5
**contingent** 111:13
**continue** 48:23
**continued** 3:1 131:14

**continuing** 14:7 14:10,20
**continuous** 26:13
**contract** 71:16 119:9
**contractor** 11:23 93:5,9 99:20
**contractor's** 12:7
**contracts** 94:22
**converging** 40:12
**conversation** 46:18 52:1 68:7 68:10 77:10
**conversations** 46:19 73:19 105:1 106:17
**convey** 58:17
**convicted** 6:14
**copies** 70:25 134:10
**copy** 27:10 54:22 58:8,10 67:6,11 81:14 81:16 82:20 83:25 85:7,8 119:10 129:18
**coral** 1:13 26:3 67:23 68:4
**corp** 62:23
**correct** 13:1 18:21 22:13 24:4,9 25:11 26:24 27:5 28:3 28:22 29:21,23 30:14 31:9 32:3 32:5 33:5 34:8 41:7,8 43:8 47:12,25 48:2,5 48:16 51:18 57:10 59:10 62:23,24 63:6 63:11 64:20 66:16,17 67:8 68:12 69:21 72:8,23 73:3 74:3,4,6,12 76:24 77:5,12 77:15 78:18,19 78:21 79:17,23 82:22 84:3 88:24 89:1,4,18 91:3,7,9,14 92:2 92:13,16,19,23 93:24 95:12 97:12 101:3 109:22 112:6,12 113:14,16,20 114:14 118:17 120:15 123:12
**correctly** 19:21
**correspondence** 3:14
**cost** 5:19
**costs** 112:5
**counsel** 2:3,6 4:7 22:1 103:3 120:2 133:12
**counsel's** 131:15
**countertop** 34:24
**county** 68:12,14 71:7 86:4 95:16 124:23 133:4,15
**couple** 18:8 23:2 46:24 95:4,7 100:3 101:7 131:20
**court** 1:1 4:8 5:22 6:10 7:2 68:12,13,14,22 70:8 73:12 86:4 86:9 108:2 120:14 124:3
**covers** 112:4
**covid** 33:24 34:2 47:24
**crabtree** 3:16
**crawl** 25:24 26:4
**credit** 14:21 23:19 59:4,5 60:18 97:20
**credits** 14:9
**cross** 2:14 9:4 131:21
**crosstalk** 126:23
**current** 11:7 16:11 17:2 18:20 23:23 129:8
**currently** 16:17 20:14
**cv** 1:2

**d**

**d** 1:19,19,20 2:13 27:4,4
**dade** 68:11,14 71:7 86:4 95:16 133:4,15
**damage** 3:10 19:22 20:5 69:2 101:12
**damaged** 19:18 19:22
**damages** 109:5 131:24
**date** 4:5 10:6 45:11,12 63:23 68:17,18,24 82:2,21,23 83:16 84:7 106:19 116:10 117:21 119:10 123:17,17 124:11,12 134:8 135:3,21
**dated** 80:5 111:16 112:8,9

116:7
**dates** 64:15,17
**dating** 116:8
**daughter** 11:6 24:12,23 35:22
**daughter's** 20:20 93:15
**davis** 75:14
**day** 35:19 36:12 43:1,2,4,6 45:18 50:9 56:15 74:5 76:19 77:1 82:14 83:8,10 101:17 133:15
**days** 9:8 51:3 56:7 134:11
**de** 1:13
**deal** 9:10,21 38:13
**dealt** 19:16
**decade** 113:22
**december** 133:15 134:3
**declarations** 27:11
**declaratory** 72:2,12
**declare** 135:18
**deduction** 128:5
**defendant** 1:10 1:23 2:8 4:11
**defendant's** 2:18 3:2 21:24 54:9 62:9 71:4 71:20 79:1 83:22 84:11 86:18 98:3 111:22 115:23 117:11 118:21 123:25 125:7 128:11 129:12
**defenses** 130:20
**definitely** 36:2 36:25
**degree** 14:23
**delay** 103:23,24 104:9
**demand** 3:17,19 3:21,22 16:1 125:3
**demo** 93:7,22 94:4,23
**depo** 6:25 122:15
**deposed** 5:8
**deposing** 134:9
**deposition** 1:23 4:3 5:2 6:4 15:3 16:14 73:11 131:14 132:19 133:7,10,11
**describe** 28:5 29:25 36:24 48:8 51:23
**description** 2:18 3:2 22:7
**designation** 9:9
**desk** 22:12
**despite** 47:11
**detail** 17:17
**determining** 60:10
**diagram** 32:13
**diehard** 38:7
**dies** 38:14
**difference** 128:20
**different** 18:23 31:18 76:19 101:7 107:14 114:16 117:5
**digging** 94:18
**digital** 37:14
**dining** 34:17,18
**dinner** 30:10,14 34:19 35:13 36:5 39:15
**dinners** 36:8,9
**diploma** 14:24
**direct** 2:14 4:18 54:25 115:7,7
**directly** 85:1 108:13
**dirty** 36:23,25 37:1
**disagree** 70:7
**discuss** 50:5 77:8
**discussed** 104:23 105:3,7 105:10 129:18
**discussion** 55:8
**discussions** 75:25 78:3 106:14
**dishwasher** 36:15
**dismiss** 86:24
**dismissal** 3:9 86:10 87:7
**dismissed** 16:15 87:2
**dispute** 45:13 55:21 62:15 64:15 113:18
**distinction** 57:2
**district** 1:1,1
**divulge** 105:16
**document** 3:10 16:3 21:23 22:4 31:17 54:8 62:8 71:3,10,19,23 78:25 80:17 83:21 84:10 85:5 86:17,21 98:2,13 99:15 111:21,25 115:22 116:2,4 116:18 117:10 117:25 118:10 118:16,20,25 119:19 120:4 121:20 123:10 123:24 124:2,5 124:14 125:1,6

125:12 128:10 129:11 135:19
**documents** 15:19,22 16:6 27:10 59:25 61:19 110:15 111:15 117:1,8 117:16 121:16 121:18 131:4
**dog** 24:17
**dogs** 24:18
**doing** 6:25 14:21,22 16:14 27:13 51:24 52:9,11 54:23 56:4 60:25 65:25 66:10 75:23 99:5 101:21 108:15
**dollars** 69:11 97:11
**door** 32:16 39:7
**double** 90:12
**doubt** 47:22 64:19
**draft** 130:11
**drain** 42:14 88:15 90:17
**drained** 42:21
**draining** 43:25
**draw** 32:21
**dried** 42:23
**drove** 93:17
**drywall** 93:8,9 93:25 95:23,24 96:3,7 97:17,22
**due** 103:12,22 107:5 108:8
**dug** 58:13 88:10 88:11
**duly** 4:16 133:8
**durock** 96:4
**duties** 108:1,5
**duval** 124:23

**e**

**e** 1:19,19,20 2:6 2:13,22 10:20 13:8 27:4 61:25 62:3,4,5,12,18 67:8,10,16,18 80:22 81:1,2 94:2 101:8,13 101:17,18,21,24 102:3 134:9,10 134:18,18
**earlier** 24:7 62:4 66:20 79:22 109:16 129:18 131:13 131:23 132:6
**earliest** 82:2,10 82:13 83:9
**early** 27:14,17 36:8 57:8
**easier** 20:11 130:6
**easy** 75:17
**eating** 34:20
**education** 14:7 14:7,11
**effect** 69:11
**effective** 81:6
**eight** 55:22
**either** 31:24 33:11 36:1 43:7 45:21 59:4 60:9 61:12 62:3 67:4 70:7 76:3,4,6 101:8 133:13
**eliminated** 88:2 88:5
**employ** 113:1
**employed** 11:21 11:25 12:5 122:1
**employment** 12:2
**enclosed** 28:13
**ended** 96:19,20
**engagement** 121:8
**engine** 102:2
**engineer** 50:14 50:17,22,23 61:4
**english** 93:13
**entire** 52:16 61:9
**entitled** 133:7
**equity** 23:13
**errata** 134:7,9 134:11 135:1
**esq** 2:3,6 134:1
**established** 101:2
**estate** 5:18 12:3 25:7 37:15
**estimate** 3:3 78:23 79:8 94:14 95:3 97:4
**estimated** 109:20
**estimates** 94:22 95:6
**et** 4:4 134:4 135:2
**europe** 91:10
**evening** 36:6
**event** 46:11 53:7 132:7,9 133:13
**eventually** 40:25 68:11
**everybody** 6:16 41:21 99:24
**ewm** 12:10
**ewm.com.** 13:12
**exact** 45:11 64:17 68:17 106:19 123:17
**exactly** 32:10 33:16 45:12 46:10 56:14 57:18 60:8

104:15
**examination** 4:18 5:24 131:21
**examined** 4:17 133:8
**exhibit** 2:19,20 2:22,23,24 3:3,5 3:6,8,10,11,13 3:14,16,17,19 3:20,22 21:22 21:24 22:2,4 30:6 32:22 54:7 54:9 62:7,9,11 66:19 69:14,15 71:2,4,17,20 78:22 79:1 81:20,23 83:20 83:22,24 84:9 84:11,14 86:16 86:18 88:13,13 98:1,3 109:16 111:19,22,25 115:20,23 117:11 118:21 121:9 122:2 123:23,25 125:1 125:5,7 128:9 128:11 129:10 129:12
**exhibits** 2:17 3:1 121:19 125:5
**expect** 107:17
**expecting** 28:1
**expenses** 111:7 111:10
**expert** 5:17,17
**experts** 131:8
**expiration** 133:23
**extended** 24:25
**extent** 104:25 106:9
**extra** 107:17
**eyes** 7:4

**f**

**f** 1:4
**facebook** 13:17 13:25 25:18 95:19
**fact** 75:21 109:14
**facts** 135:19
**fails** 134:13
**fair** 7:19 8:19 19:11 27:24 49:1 57:2 99:11 113:17 128:5
**fall** 87:22 94:9 94:10 123:20
**familiar** 55:3 56:18 59:12 62:13 84:16 99:15,18 126:3 129:15
**family** 21:7 30:13 34:10,12 34:13,24 38:19 39:3,4 77:3
**far** 6:25 8:17 27:13 44:24 60:13 63:17 64:14 85:13 87:20 102:17 111:6 121:18
**farm** 1:9 2:22 4:4,11,25 8:25 16:10,25 17:3 17:23 18:22,25 19:1,6 20:3 26:9 26:15,17 45:8 46:1,9,15,16,20 48:3 67:19,20 69:1,20,22 70:6 72:7,17 73:12 75:3,7,10 81:20 81:22 82:3,8 83:12 100:25 107:23,24 108:9 124:23 130:14 130:20 131:13 134:4 135:2
**farm's** 45:15 61:2
**federal** 124:3 134:12,18
**fee** 3:13
**feel** 70:23 99:24 109:9
**feeling** 17:21
**fees** 111:6,10
**feet** 21:13
**felony** 6:14
**felt** 107:3
**fema** 17:8,8,9 17:13
**fence** 19:21 29:7
**fewer** 114:10,11
**ff158527** 133:22
**figure** 8:2
**file** 9:19 86:9 98:19
**filed** 68:11 71:7 85:17 86:6,11 87:8 101:4 114:4 123:15 126:6,7 127:17 128:14 129:5,24 129:25 130:6,7 130:8,10
**filing** 68:18 106:5 124:7
**fill** 119:12
**filled** 30:2,14
**final** 100:16
**finalized** 81:6
**find** 58:14 60:12 60:14 93:14 101:11
**finding** 111:4
**findings** 2:20 54:12 62:20

**fine** 6:18,18 7:9 8:11 28:6 44:14 44:15 73:23 75:19 105:21 115:14
**finish** 8:8 27:15 27:17 59:17 93:11 94:4
**finished** 50:6 93:1
**firm** 118:17 120:12,19 121:3 121:6,10,13,16 122:2,6 123:3,6 123:10
**firms** 110:22 117:5
**first** 26:9 35:25 38:16 47:7 61:7 62:12 63:21 70:1,11,24 71:8 71:25 73:4,8 76:20 80:21,24 98:7 104:2 106:16 111:16 113:4,4 114:2 122:1 133:8
**five** 44:16 114:10,11 122:9
**fix** 62:21 97:2
**fl** 134:9
**fla7740553** 135:3
**flappers** 42:7
**flip** 55:12 85:5 124:10
**flood** 17:5,6 26:20 132:8
**floor** 2:3,19 21:16 22:6 42:15 91:18 92:4 99:7
**floors** 28:14 29:19 94:19 96:1,2
**florida** 1:1,9,13 2:4,7 4:4,11 10:9 11:9 99:24 124:24 126:4 133:3,6,15,22 134:12,18
**flow** 22:14
**folks** 107:4
**follow** 81:18 131:20
**following** 55:9
**follows** 4:17
**footage** 21:11
**foregoing** 135:19
**forget** 110:25
**form** 56:11 69:6 70:12 72:24 82:4,16 85:12 86:1 87:3,7,9 108:11,25 114:7 115:11 120:20 122:7,23 126:9 127:13 130:16
**forth** 131:7
**forward** 74:3
**found** 55:5
**foundation** 25:20
**four** 22:10 122:9,18
**friend** 93:8 94:1
**front** 16:2 54:14
**full** 5:3 28:21 30:3
**functional** 92:21
**further** 131:12 132:15 133:11

**g**

**gables** 1:13 67:22,23 68:4
**garage** 25:17,19 32:12,17 33:4 97:9
**general** 93:5 100:3 104:19
**generally** 47:2
**gentleman** 68:6 79:21
**gentlemen** 75:23 77:6
**getting** 57:12 105:13 108:8 109:20
**girl** 11:5
**give** 12:1 14:6 51:1 58:10 59:25 61:18 67:11 72:14 99:9 131:10
**given** 133:10
**giving** 57:16
**glasses** 35:5
**go** 6:6 9:14 23:12 33:3 38:13 42:14 46:25 49:2 60:13 66:2,3,3,8 73:20 74:3 76:25 93:21 94:13 97:2,7,9 102:14,17 105:22 106:13 110:1 111:14 113:19 125:22 126:1,15,22 128:6 129:9 130:16
**goes** 26:8 70:7 89:16 90:14 91:5
**going** 4:9 6:6 7:4,18 8:6 20:10 21:21 31:16 44:12,20 51:19 53:5 54:3 59:20 61:10 65:9 70:10,22 71:2

74:3 85:17 87:12 93:2,17 100:11 102:19 103:18 106:20 110:2 111:14,18 113:18 125:4,18 126:24 128:9 132:17
**good** 4:1,20,21 4:22 10:23 27:13 34:1 40:1 44:13 53:25 54:2,3 87:11 93:19
**grabbing** 40:22
**graduated** 24:11,12,12
**grandchildren** 95:21
**graph** 32:12
**great** 17:21 27:17
**grew** 10:10,15
**grossman** 2:2 134:1
**ground** 37:8 38:17
**grounds** 48:19
**group** 2:21 3:13 54:13 113:2 114:6 115:2 117:6
**growth** 96:17
**guess** 5:17 18:14 29:17 33:21,23 36:23 38:24 40:9 47:18 50:17 54:17 68:13 74:8 85:22 90:13,25 94:3 99:1,13
**guessing** 24:8 31:2 66:18
**guest** 30:9,13 31:14,20 32:4 32:11 34:5 41:12 88:17,17 88:19,23
**gun** 59:21
**gut** 29:19
**guy** 50:16 51:4 82:7 93:11 95:13 96:2 97:17,17,20
**guys** 9:15 36:11 50:5

**h**

**hair** 41:22
**half** 15:6 23:10 33:22 122:14
**halfway** 103:20
**hallway** 30:4,13 30:16 34:6 39:6
**hand** 70:22 133:14
**handed** 62:11
**handful** 114:9 114:19
**handle** 70:16
**handled** 26:23 100:21
**hands** 52:18
**handwriting** 116:9
**handwritten** 119:13
**handyman** 94:1
**happen** 86:7
**happened** 29:25 34:2 46:11 56:15 85:11,25 86:2 91:16 132:8,11
**happens** 45:2
**happy** 95:5
**hathaway** 12:10
**he'll** 131:19
**head** 7:9,10 19:23 27:3 61:20
**health** 11:18
**hear** 12:23
**heard** 4:25 32:1 70:1 95:9 99:18 99:25 104:17 124:20
**hearing** 48:18
**helocs** 23:14
**help** 39:17,22
**helped** 39:20,24
**helper** 65:20
**hereinabove** 133:9,12
**high** 14:23 24:11 96:25
**highest** 14:6,23
**hired** 57:6,6,17 62:18 88:7
**history** 12:2 55:11
**hold** 32:23 34:17
**holder** 83:19
**holding** 23:10 52:18
**holes** 97:2,3
**holidays** 24:19
**home** 2:19 11:7 12:16,18 18:8 23:13 25:8 26:10,16 47:20 66:15
**homeowner's** 17:2,3
**homeservices** 12:10
**homestead** 21:3
**honest** 27:2
**honestly** 58:15
**hopefully** 42:14
**hospital** 48:2

**hotmail.com.** 13:11
**hour** 15:5,14,14 44:13 122:13,13
**hours** 14:14,17 15:6
**house** 18:12,20 20:11,20,20,24 20:25 21:3 22:7 22:16,21 23:23 24:5,24 25:2,6 25:15,20 26:5 26:19 27:20 28:5,8,11,12 29:18 32:17 36:11 41:21 48:13 49:3 50:15 52:7,10 52:20 53:1,4 60:2 66:8,10,13 66:19 68:7,8 76:1,8 77:4 78:8 87:23 90:19 91:4 93:15 94:6 94:19 98:8 99:12 113:9 118:8
**houses** 20:14,17 21:2 95:4
**huh** 35:9 55:17 63:8 64:13
**hurricane** 18:10 18:24
**hurricanes** 18:9

**i**

**i.d.** 2:18 3:2
**idea** 81:4 94:18 108:20
**identification** 21:24 54:9 62:9 71:4,20 79:1 83:22 84:11 86:18 98:3 111:22 115:23 117:11 118:21 123:25 125:7 128:11 129:12
**identified** 92:9
**identify** 55:6 101:11 106:10
**identifying** 131:1,4
**immediate** 36:17
**immediately** 27:18 28:4 44:5
**include** 54:20 129:9
**included** 54:21 78:6 109:17,24
**includes** 78:23 105:1
**independent** 11:23 12:7
**indicate** 80:4,6
**indicates** 86:9 88:14
**indirectly** 108:14
**individual** 107:15
**individually** 1:5
**information** 55:9 101:16 131:1
**ing** 42:15
**initial** 50:19
**initially** 112:19 113:1
**ink** 91:11
**inside** 66:8,10 66:13
**inspect** 50:15 52:20 62:19
**inspection** 22:17,19 47:7 47:14 48:20 50:6,19 51:6 60:7 63:24 64:4 64:12 65:25 74:8,13 97:23 97:24
**inspections** 65:3 74:8,14,25 75:5 75:22,23 101:1
**instagram** 13:17 13:25
**installation** 93:11
**installing** 93:23
**instruct** 105:1 105:17 125:18
**instructing** 103:5
**instruction** 9:18 9:19
**instructs** 7:15
**insurance** 1:9 4:4 18:9 26:18 26:20,23 45:6 99:19 101:5
**insured** 26:9
**insureds** 107:5 107:22 108:10
**insurers** 18:23
**interest** 16:9,25 17:1 23:11 103:12,22 107:5 107:8 109:2,10 109:17,20,23 110:12 127:9 131:24
**interested** 133:13
**interior** 20:6
**interview** 55:8
**involved** 6:20 16:24 74:11 77:9 104:16 107:16
**involvement** 100:6,9,15,25

**iphone** 37:24 38:2,3
**irma** 17:21 18:14,18 19:13 19:17,18,19,24 20:7 29:1,8
**iron** 88:2,5,15 92:21
**island** 34:25
**issue** 29:7 83:12
**issued** 17:12
**issues** 41:11,25 43:25

**j**

**jackhammer** 92:15
**jackhammered** 91:18
**james** 57:22,22 58:1 79:20,21 79:24
**jane** 108:17
**jason** 2:3 4:12 7:10 8:21 15:5 98:11 106:15 134:1
**jesus** 78:14 79:20
**jk** 2:4 134:2
**job** 10:23 39:19 50:4 134:4 135:3
**jod** 133:6,21
**jog** 56:2
**joined** 110:8
**jones** 75:18
**jp** 22:24 84:6
**jr** 2:6
**judge** 98:20
**judge's** 9:18,19
**judgment** 72:2 72:12
**july** 119:6,12
**jumped** 59:20
**june** 45:12 47:11 50:24
**jury** 3:18,19,21 3:22 6:8 125:3
**jut** 35:8,10

**k**

**k** 1:4 3:7 62:22 96:15
**kellogg** 2:2,3,16 4:12,12 8:23 9:5 9:16,23 10:1,24 15:21 17:10,18 21:20 23:12 32:21 34:3 39:1 44:12,16 48:17 56:11 59:17 69:6,14 70:12 72:24 73:21 81:14,18 82:4 82:11,16 84:20 85:4,12 86:1,12 87:3,9 98:14,19 103:3 104:25 105:6,9,13,21 106:4,9 108:11 108:25 110:1,24 111:18 114:7 115:11 120:3,4 120:8,20 122:1 122:7,19,22,23 123:3,6,18 125:18 126:1,9 126:14 127:13 130:16,22 131:19,22 132:15 134:1,1
**kellogg's** 123:3
**kenneth** 2:3 134:1
**kept** 61:21,23
**key** 88:14
**kids** 24:18,22,22 28:23
**killer** 29:15
**kills** 96:18
**kilz** 96:12,14,15
**kind** 25:20 37:22 38:18,19 40:12 42:9 51:19 61:18 88:22 92:20 101:10 102:9 108:23
**kindly** 134:15
**kit** 97:13
**kitchen** 19:22 28:16 29:8 33:4 34:21,22 88:12 89:6,17 90:22 96:20,23,25
**kitchens** 28:14
**knecht** 3:7,13 3:14 9:13,17 21:17 63:2,3,5 63:14 84:23 86:11 98:5,15 103:1,13 106:15 110:24 113:2,2 113:21 114:5,6 115:2,10 117:6
**knecht's** 117:3
**knew** 90:6 113:6
**know** 5:15 6:3 7:22 8:6,11 9:2 10:15 16:14,17 17:14 18:18 19:5,15 21:11 23:1,1,2 25:9 26:8,8 27:2 32:20 33:1 34:3 35:2 36:16 37:19,23 38:9 39:13 40:5,23 41:13 43:5 45:11,17 49:4 51:2,3,4 53:5,7 56:20,24 57:5 58:6,7,16 59:11

59:20 60:5 61:24 63:2,4,17 64:21 65:6,7,11 65:14 68:24 70:14 72:3,12 72:23 73:1,7 75:5,15,19 76:14 77:23,25 79:12 80:24 81:3,3,8,9,13,19 83:16 85:3,19 85:21,24 86:7,8 86:24 87:10 91:15 93:12,20 94:17 95:7,8 97:3,7 99:2,5 100:4 101:14 102:7,14,15,15 102:17,21 103:20,22 106:18 107:6,6 108:16,17 109:12 113:5 115:6 119:10 121:2 122:12,15 123:13,14 124:18 125:17 125:24 126:10 126:11,12 127:4 128:2,17,25 129:19 130:9,14 130:18,19,23 132:4

**knowing** 81:21
**knowledge** 51:10 121:14 123:4 127:12
**known** 10:2 113:7
**knows** 97:3 100:1

**l**

**l** 5:7 27:4,4 96:15
**labeled** 9:11 34:9 89:13,14
**lack** 36:23
**large** 70:23 133:6
**late** 27:15 36:8
**laundry** 32:11 32:18 91:2
**law** 3:13,14 110:22 113:2 114:6 115:2 122:6
**lawsuit** 5:1 6:20 14:1,4 16:8,11 16:13 27:7 68:11 85:17,20 107:15 123:14 124:22
**lawyer** 55:3 105:3 113:15 125:22
**lawyers** 9:25 14:3 105:1 106:10,11
**layman** 85:20
**layout** 22:14
**leading** 32:16
**leave** 94:6
**left** 42:18 50:9 53:24 54:5
**legal** 3:11 113:25 134:17
**legalities** 73:17
**legally** 69:24
**lehman** 2:2 134:1
**leon** 1:13
**letter** 3:6 112:8
**letterheads** 120:7
**level** 14:6 17:16
**leveled** 42:10
**levine** 2:2 120:3 122:1 134:1
**license** 13:2 93:6
**licensed** 12:3 57:4
**licenses** 13:4
**likely** 36:13 51:12,14 53:20 59:6 60:23 61:22 66:15 80:19
**limit** 66:6
**line** 19:17 23:19 38:23 89:2,2,5,6 89:16,21 90:14 90:22 91:1,4,5,8 91:16 92:17 135:4
**lines** 88:14,15 90:16,17
**list** 26:6 131:5
**listed** 96:9 124:13
**litigation** 20:7 85:24 86:3
**little** 91:25 96:21
**lived** 11:10 25:2
**lives** 24:5
**living** 28:14
**lklsg.com** 2:4 134:2
**llp** 2:6
**loans** 23:13
**locka** 108:17
**logged** 98:14
**long** 5:16 11:10 12:11,12,24 23:5 33:17 36:4 39:12 40:19 43:5,10 49:17 49:18 53:16 76:7 78:8,8,10 90:5 103:21 113:8 114:19

122:10
**longer** 40:6 52:19
**look** 37:19 60:11 62:13 70:19,23 79:3 80:10 81:17 84:16 85:4 88:13 98:6 111:24 115:25 118:23
**looked** 43:12 66:20 99:12 103:12 104:4,5 123:11
**looking** 22:3 30:6 36:23 79:15 104:2 108:21
**looks** 22:13 35:1 62:14,20 79:5,7 80:9 88:16
**loss** 27:21 28:4 33:6
**lost** 102:15
**lot** 19:17 37:21 69:2 75:5 91:11
**lots** 75:19
**louis** 5:7
**lucky** 90:6

**m**

**m** 3:7
**ma'am** 110:9
**machine** 36:14
**made** 28:13 34:13 38:18 39:22 72:9 87:23 100:21
**magistrate** 9:18
**mail** 2:22 13:8 61:25 62:12,18 67:8,10,16,18 101:18,24 134:9
**mailed** 80:22 81:1,2 134:10
**mails** 62:3,4,5 101:8,13,17,21 102:3
**major** 28:7
**make** 4:23 25:14 34:9 69:20,23 95:8 119:24 120:10
**makes** 66:21
**making** 42:5 98:21 109:7
**manner** 59:2
**marin** 1:4
**mark** 21:20 86:12
**marked** 21:24 22:2 54:9 62:9 71:4,20 79:1 83:22 84:11 86:18 98:3 109:16 111:22 115:23 117:11 118:21 123:25 125:7 128:11 129:12
**marker** 34:1,1
**marketplace** 25:19
**marriages** 10:25
**married** 10:17
**master** 30:18 32:15 34:14 41:6 88:18,18 88:20 89:3,7 91:13,19 92:1,4
**materials** 94:25
**matter** 4:3 75:21
**mean** 5:25 21:12 41:20 52:15 56:14 58:13 63:23 70:15 82:18 83:8 90:13 96:23 107:11 127:6 129:21
**meaning** 74:20
**means** 83:4 86:24 100:1
**media** 13:16 44:21 87:16 127:3
**medication** 11:14
**meet** 76:14
**meeting** 122:13
**meetings** 114:5 114:19 120:12 120:18 122:5,11
**member** 12:19
**members** 108:6 108:20
**memo** 115:17
**memorial** 35:19
**memory** 19:20 53:6 56:2 57:3
**mentioned** 24:7 29:6 44:1 62:4
**met** 15:13,18 113:21 122:15
**meter** 126:19
**miami** 2:4,7 10:9,12 71:7 86:4 95:15,16 133:4,15
**michael** 84:23 113:13,21 114:5 115:3,10
**middle** 5:6
**mike** 63:2,5 103:1 106:15
**mildew** 29:15
**mind** 14:20
**mine** 17:10 93:9 94:1
**minute** 131:10
**minutes** 15:13 15:14 44:16

114:21 122:12
**missing** 121:21
**mistaken** 20:4 25:11
**mitigation** 98:18
**moisture** 97:23 99:6
**mold** 96:17,18
**money** 62:21 69:20 72:6 109:3
**montalvo** 2:10
**months** 33:19 51:4
**mop** 40:23
**morgan** 22:24 84:6
**morning** 4:1,20 4:21 111:4
**mortgage** 22:21 83:19
**move** 24:10
**moved** 24:8,24 29:18 69:23 72:17 113:9
**moving** 111:1
**multiple** 38:6
**murphy** 57:21 57:22 58:1,1,19 59:25 74:10 75:7 79:20,21 79:24 80:4

**n**

**n** 1:20 2:13 10:20,20
**name** 4:24 5:3,6 10:4 47:5 48:6 52:2 57:21 63:15 75:12,17 77:25 79:25 84:5,5 93:12 94:2 95:10 111:2 115:4,6 124:15,16 125:12 127:18 130:25 135:21
**names** 10:2 31:16 105:19,20 106:3,10 121:2
**narrow** 106:12
**national** 12:21 17:6
**nature** 103:23
**need** 7:8 8:10,11 9:4,14,21 17:16 17:19 28:25 34:17 39:9 44:24 56:16 62:21 70:19,23 81:12 84:21 87:19 100:5 113:24 126:22 128:6
**needed** 92:3 95:24 96:8
**needing** 88:9
**needs** 81:9
**neighbor** 63:3 63:10,12,13 113:6,8,11
**neighborhood** 95:4
**neighbors** 95:5
**neither** 109:7 133:12
**never** 25:2 34:13 90:6 98:17
**new** 27:2 28:14 29:4 88:21 90:18 91:24 92:15 93:23
**nick** 27:1
**night** 15:12,18 42:25
**nod** 7:3,9
**nodding** 7:10
**normal** 41:23
**notary** 133:6,22
**note** 134:7
**noted** 131:16
**notes** 12:13 45:22
**notice** 1:23 3:8 126:7 133:7
**noticed** 35:24 38:15,16
**notices** 17:14
**november** 1:14 4:5 19:12 62:12 86:10 125:14
**number** 71:15 109:21 110:12 132:2,4
**numbered** 71:12,25
**numbers** 20:12 55:4
**nunez** 118:17 120:12 121:13
**nurse** 25:11

**o**

**o** 1:19,20,20 5:7 10:20 62:22
**oath** 5:24 6:5
**object** 7:14 9:3 9:6 48:19 56:11 69:6 70:12 72:24 82:16 85:12 86:1 87:3 87:9 108:11,25 114:7 115:11 120:20 122:7,23 126:9 127:13 130:16
**objection** 82:4 82:11 126:1,14 130:22 131:16
**observe** 52:9
**observed** 56:8

**obtained** 55:9
**obviously** 48:22 67:6 83:10 84:22 96:1 129:7
**occurred** 47:8 51:7 74:16,18 75:22
**october** 111:17 112:9 122:2 123:1,16
**offended** 7:22
**office** 22:9,11 27:7,12 30:20 30:23 34:6,6 58:14 96:9 117:3 122:22
**official** 55:10 133:14
**oh** 13:11 33:25 36:18 39:7,23 89:13,15 92:6,6 97:7 113:23 122:17 127:24
**okay** 6:2 7:7,17 8:9,16 14:19 17:16 20:13 27:23 30:12 31:19 35:1 39:7 39:7 44:16 55:5 55:7,15 56:16 57:2 70:21 71:14 72:20 79:18 81:25 90:3,15 91:21 91:25 92:6,7 105:21 115:14 118:24 121:25
**old** 37:17 91:10 92:25 96:23
**olson** 133:6,21
**once** 29:19 31:6 38:16,22 40:3 42:9 60:3 75:4,6 77:11 94:12 114:4
**ones** 44:1
**online** 45:21 60:13
**opa** 108:17
**opened** 56:6
**operated** 25:5
**opposed** 72:16 73:15
**option** 70:14
**order** 9:8 33:19
**ordered** 78:18
**ordering** 134:10
**original** 54:20 70:18 90:8,9 95:14 113:3 127:10
**originally** 86:6
**outs** 35:10
**outside** 88:12 90:21,23 91:4,6
**overall** 69:8
**overflow** 43:23 44:4 45:5
**overflowed** 30:10,15
**overflowing** 40:18
**owed** 16:9,25 109:2,9,11 127:9
**own** 11:12,13 12:13 20:14,20 20:21 30:1 45:22 104:4
**owned** 20:17 90:5
**owner** 90:9 95:14
**owners** 23:23

**p**

**p** 1:19,20
**p.m.** 44:18 132:18,20
**pa** 57:6
**page** 27:11 55:1 55:2,4,12 62:12 69:13 70:24 71:8 79:9,15 80:21 95:19 98:6 117:25 124:11 135:4
**pages** 9:11,12
**paid** 17:1 60:9 69:3 94:24 97:18 107:7,8 107:17 110:13 111:5
**paint** 96:16,17
**painted** 96:12
**palmetto** 11:9
**pantries** 29:11
**paper** 7:5 70:23
**paragraph** 71:25
**paragraphs** 71:13
**paralegal** 115:5
**parallel** 90:20
**paris** 64:23
**parking** 126:19 126:23
**part** 27:9 28:14 50:3 53:22 79:10 89:23 98:15,16,19
**partially** 96:3
**parties** 133:13 134:10
**parts** 96:6 116:20 118:12 119:21
**party** 78:3
**pass** 10:24 131:16
**past** 94:16
**patients** 25:12
**patio** 28:13 89:9

**pay** 12:6 58:25 59:2 101:18 111:11
**payable** 83:17
**payees** 84:4
**paying** 58:19
**payment** 59:2 72:9 103:24 104:9
**payments** 100:21
**penalty** 135:18
**pending** 8:13
**people** 6:4 10:14 17:7 34:3 94:17 102:8 105:14 107:16,20 131:5
**percent** 25:9
**percentage** 57:12,16 58:17
**perfect** 16:5 121:25
**period** 20:18 24:25
**perjury** 135:18
**permit** 90:8
**person** 46:15 51:15 56:18 57:20 65:16,18 75:9 113:5 114:22
**personal** 121:9 123:2 133:9
**personally** 109:8
**phone** 37:13,17 37:22 46:19 62:1,2,6 67:16 67:17 102:16,23 114:22,23 120:25 122:12 122:17,18
**phones** 37:21 38:11,12 102:8 102:12
**photocopy** 54:19
**photographs** 54:21 101:8,12
**photos** 37:18 50:4 102:10,12 102:17,19,22
**phrasing** 130:6
**pick** 26:15
**picks** 91:5
**pictures** 21:19 37:4,7 49:20,23 50:1 53:18 60:7 76:10 98:7 99:11
**pipe** 88:21
**pipes** 64:4 88:2 92:21 94:25 95:23 97:5
**piping** 88:8
**place** 54:24 92:3 133:12
**plaintiff's** 3:8
**plaintiffs** 1:7 2:5 4:13 131:7
**plan** 2:19 21:17 22:6
**please** 4:7 5:4 7:22 8:4 116:1 125:23 131:11 134:8
**plumber** 42:24 43:1 46:13,16 62:19 88:7 97:19
**plumbing** 31:24 31:25 33:11 62:19,21,23 64:6 67:7,22,23 68:4 69:5 93:7,8 93:10 94:16 95:9,10,15 101:24
**plunger** 41:19 41:20
**point** 5:14 26:5 31:7,21 35:12 37:5 39:8 42:18 42:21 43:11,13 46:12 49:3 52:22 56:25 57:15 58:2,3 60:25 63:24 64:11 68:25 69:18,22,25 70:4 71:24 72:19 73:15 74:10 80:23 82:6 84:18 85:16 87:21 97:24 99:13,24 106:22 131:12
**pointed** 52:23
**policies** 107:6
**policy** 17:1,23 26:17 27:11 103:11,13,15 104:5 107:7,9
**ponce** 1:13
**pool** 28:22
**port** 102:12
**portion** 89:5 103:15
**position** 72:18 72:18 109:15
**positive** 18:19 49:24 85:8 97:21
**possession** 9:25
**possible** 82:2,10 82:13
**posted** 13:24
**potential** 108:6
**potentially** 124:11
**pre** 47:24
**preface** 54:18
**prejudice** 86:11
**prepare** 15:3,19

**prepared** 78:23 79:12
**presence** 80:2
**present** 2:9 46:7 47:14,16 74:18 74:21 116:14 118:4 132:7
**presents** 90:10
**preserved** 48:18
**pretty** 28:21 44:8 52:13,14 75:16 85:8
**prevents** 96:17
**previous** 16:12 26:16
**previously** 16:15
**primarily** 69:4
**print** 35:2 54:22 70:25
**printed** 119:11
**prior** 27:18 28:4 28:7,9,10 36:12 41:12 46:22 59:15 63:24 64:11 83:1,3 104:16,17 113:24 121:8 123:1,2 128:18 130:5
**privilege** 98:12 103:7
**privileged** 98:18 105:20 125:19
**probably** 8:21 9:3 20:11 23:17 25:8 26:2 36:10 36:20 45:16 46:10 47:24 52:19 55:20 57:23 60:21 63:2 67:17 72:23 74:23,24 80:14 93:3 94:7 94:19 95:21 100:1 101:17,25 102:8 103:20 112:10 113:22 122:13,18 124:10
**problem** 62:21 64:5 111:4
**problems** 90:11 90:12
**procedure** 134:18,18
**process** 27:9 59:8 72:16 75:4 75:6 104:1 106:20 114:13
**produce** 9:19
**produced** 9:11 9:24 98:15 109:12
**product** 98:12
**production** 9:17
**professional** 3:4 12:19 13:4 78:24
**pronet** 2:21 54:12
**property** 5:19 61:1,10 76:17 78:5 79:6 90:4
**proposed** 102:24
**protective** 9:8
**provide** 67:6
**provided** 67:7
**public** 56:20,22 56:24 57:4,6 59:12 133:6
**pull** 119:9
**pump** 42:12
**purchased** 21:5
**purpose** 51:23 91:1
**purposes** 20:23 21:16 98:23 120:17
**pursuant** 1:23 9:18 126:7 133:7
**put** 25:18 29:4 32:20 48:17,23 55:19 82:21 88:7 92:15 96:12 97:9 131:7
**pvc** 88:8,21 90:17,18,19 91:12,22 92:15 92:24

**q**

**quality** 96:25
**question** 7:18 8:10,13 15:21 26:21 59:18 65:9 85:15 97:6 103:5,6,8,10 104:25 105:5,10 105:14,16 106:4 106:12 115:7,8 125:20 126:16
**questions** 6:4,17 7:1,1,14,16,22 8:5 48:20,22 49:13,15 50:12 51:20 53:12,14 61:15 65:23 68:3,9 77:1 85:5 100:3,11 105:22 108:4 112:15 131:13,20 132:15
**quick** 39:14
**quickly** 44:8
**quite** 58:15 113:7

**r**

**r** 62:22 94:2
**ran** 88:21 89:3 90:18,20
**range** 109:11

**rate** 23:11
**rates** 23:6
**rather** 27:14 117:2
**reach** 64:3 104:7,8
**read** 8:22 55:13 55:14,16 64:15 80:8 84:20 103:14 112:13 116:12 118:2 119:14 131:17 131:17,19 134:6 135:18
**reading** 20:11 105:22
**ready** 73:25
**real** 5:18 12:3 25:7 37:15
**realized** 113:17
**really** 47:13 90:25 95:20 100:9,10 101:19
**realtor** 11:22 12:25 14:8 21:14 26:1
**realtor's** 13:2
**realtors** 12:21
**realty** 12:10
**reason** 45:13,17 47:11 55:21 62:15 64:19 72:3 87:6 134:7 135:4
**reasonable** 134:12
**recall** 9:1 31:11 31:23 32:10 33:15,18 36:1,4 36:13 37:20 40:5,20 42:17 43:10,21,22 46:10,14,23 47:7 49:4,6,7,10 49:14,16,18 50:2,7,10,14 51:21,25 52:2 52:11,15,21,25 53:3,9,13,15,17 53:23 54:6 56:4 57:18 58:6,15 58:18,19 59:1,6 59:7 60:1,8 61:6 61:12,20 63:23 64:17 65:2,5,12 65:17,22 66:11 66:23 67:10,13 67:14,17,21 68:17 72:5,21 73:4,9,11,14,17 74:7,13,16,22 76:2,5,7,14,15 77:1 78:10 86:22,23 87:5 97:24 104:15 106:23 121:1 122:25 129:22 129:25 130:5,9 131:25
**recap** 34:4 92:20
**receipt** 134:11
**received** 67:9 80:24 81:20 82:3,6,8,14 83:1 83:10,25 85:9 85:16 87:22 106:22 109:16 121:5
**receiving** 81:22 85:10
**recently** 93:1 106:1
**recess** 44:19 87:14
**recognize** 22:4 111:25 116:2 117:13 118:25
**recollection** 41:24 57:24 64:14 123:19
**record** 4:2,8 5:4 7:5 44:17,21 48:18,23 54:19 60:11 72:16 84:13 87:13,16 98:22 110:1,3,4 110:6,7 111:16 124:3 126:25 127:1,3 132:18 133:10
**records** 47:10 50:23
**recover** 109:8
**recovery** 57:12 57:16
**recross** 2:14
**red** 32:2 88:14 89:5
**redid** 28:12,12 88:3 91:15,22 92:11
**redirect** 2:14
**redo** 91:23
**redoing** 97:4
**redone** 88:11
**reduced** 133:9
**refer** 20:10 31:16
**reference** 21:16 21:18 69:10
**referenced** 18:2 134:5
**referred** 21:23 54:8 62:8 71:3 71:19 78:25 83:21 84:10 86:17 98:2 111:21 115:22 117:10 118:20 123:24 125:6 128:10 129:11
**referring** 21:1 27:21 28:2 41:19 75:2

81:23 82:25 86:5 115:16,17 117:8
**refinance** 23:6
**refinanced** 23:1 23:8
**refinancing** 23:3
**reflect** 110:7,15
**reflected** 121:8
**reflects** 124:7
**regard** 134:12
**regarding** 27:7 45:22 46:20 55:10 87:20 110:20 120:11
**regular** 96:7
**reid** 1:2
**related** 18:24 101:16 121:23
**relating** 16:6 20:7 87:23 101:8
**relation** 56:23 63:17
**relationship** 121:10,12 123:3 123:6
**relevance** 48:19
**relevant** 48:24
**relief** 108:23 126:12,17 127:4 127:7 128:20
**rely** 7:6
**remember** 36:16 37:10 45:25 46:18,25 47:2,13 48:6 50:13 56:14 65:7 75:9,12 130:11 132:9
**remembrance** 51:11
**renovated** 90:19
**renovations** 28:8
**rent** 11:12 26:6
**rental** 5:18,19
**rented** 25:2
**rep** 106:8 107:2
**repaired** 29:14
**repairs** 28:8 69:20 87:23 96:8 100:15
**repeat** 51:20 53:2 126:16
**repeated** 8:10
**rephrase** 8:1
**replaced** 88:3,3 88:15 90:17 91:12 92:19
**replacement** 94:23
**replacing** 42:8
**report** 2:20 5:18 45:5,18,20 46:9 51:5 53:23 54:12 55:2,12 61:18 62:22 64:16,18 67:7 67:19 78:16 98:18 99:9
**reporter** 4:9 7:2
**reports** 115:9 121:5 122:21
**represent** 4:25 9:23 72:15 107:21 108:3,7 108:21
**representation** 3:11,16 99:12
**representative** 6:22 102:25 104:23 105:8 107:10,18 108:2 110:16
**represented** 5:13,14 120:14
**representing** 107:12 110:22 113:13
**request** 27:10 112:21 116:23 118:14 119:24
**required** 7:15
**requires** 105:16
**reserve** 8:25 9:5
**reserves** 131:14
**residence** 55:11
**resolved** 19:25
**respond** 8:5
**responded** 130:14
**response** 3:10 7:12 83:12 125:20
**responses** 7:8
**responsibility** 111:10
**result** 29:1 74:2
**results** 69:4
**retain** 56:22
**retained** 59:13
**retainer** 120:3,5
**retired** 27:1
**returned** 134:11
**reveal** 73:21 125:19
**revealing** 103:7 103:9 125:21
**review** 15:19,22 15:24 129:23 134:6
**reviewed** 121:9
**reviewing** 130:5
**rid** 13:20
**ridge** 26:3
**right** 8:3,7,23 9:1,5,20 10:16 13:23 19:14,16 19:18 20:15,25 23:11 28:2 32:2 32:25 34:23,23 35:6,8 38:14

40:15 41:24 42:22 44:3,11 44:15 57:10,23 63:7 68:19 70:24 73:2 80:1 82:19,24 84:24 86:14 90:24 92:6,10,12 95:17 98:25 100:19 109:3,25 113:11 115:19 116:10 119:7 122:15 125:2 128:15 131:14 131:18
**ring** 78:14
**road** 50:22 57:1 57:7 58:4
**roberts** 94:2
**rock** 26:3
**rodriguez** 78:14 79:20 80:6 110:24 118:17 120:11 121:13
**roll** 7:4
**roof** 19:21 28:25 29:4 66:3,4 68:8
**room** 28:13 30:13 32:18 34:10,12,13,17 34:24 38:19 39:3,4 48:14,15
**rooms** 40:13
**rothell** 3:7
**roughly** 13:7 33:22 36:5 94:8 94:9
**ruined** 39:15
**rule** 8:12 134:18 134:18
**rules** 134:12
**run** 12:1
**running** 36:15 42:3
**runs** 88:17 89:6

**s**

**s** 1:4,20 5:7
**safont** 1:4 4:4 124:17,18 134:4 135:2
**sale** 25:14 26:6
**salvaged** 91:16
**sandra** 1:4,4 4:3 124:17 135:2
**sanitary** 56:8
**save** 70:25 97:1 124:4
**saw** 34:11,13 36:22 39:6 40:3 87:7 104:8 128:3 130:9
**saying** 26:22 50:20 53:6 82:9 86:23 105:9 106:11
**says** 30:9,19,23 34:23,24 35:1 51:2 55:9,13,23 55:25 56:3,5,13 62:18 63:23 66:20 84:22 89:9 98:11,24 125:2
**scheme** 29:17
**schneider** 2:2 134:1
**school** 14:24 24:11
**scott** 2:6 4:10,24 17:18 48:17
**scott.allbright** 2:8
**seal** 133:14
**search** 101:10 101:21,24 102:1 102:2
**searched** 101:15 101:23
**second** 2:3 3:20 52:17 55:13 65:7,10,12 76:12 79:9 90:1 91:6 128:7,14 128:23 129:1,4 129:20 130:3
**secretary** 115:4
**section** 44:15 55:8
**see** 7:3 16:2 25:17 32:24 35:8,10 38:19 40:20 64:4 71:7 71:12 89:11,13 89:13,15 91:25 100:18 103:22 124:8,11,15,16 125:15 127:16 129:4
**seeing** 38:24 86:22,23
**seek** 9:1
**seeking** 69:18 69:19 71:15 72:6 73:11 108:23 109:8 127:8
**seem** 86:13 117:23
**seemed** 50:1
**seems** 116:10
**seen** 54:16 71:10,22 79:9 80:17 86:20 98:17 115:8 122:21 124:5 125:9 129:16 131:4
**seeping** 38:20
**sees** 25:12
**segment** 59:24
**self** 11:25 12:5

**send** 67:20
**sense** 66:21
**sent** 50:16,17,22 51:2 67:21 68:6 75:7,10 80:23 84:23 85:1
**separate** 17:4 120:3
**september** 19:14 68:18 82:3,15,21 83:9 124:8,12 128:14
**septic** 88:21,25 89:24 90:1,7,10 90:14 91:6 92:18
**septics** 90:3
**serve** 107:1
**served** 95:15
**serves** 19:21 57:3
**service** 3:4 78:24
**services** 113:25
**serving** 104:23 105:8 106:7 110:16
**settled** 85:22
**settlement** 16:9 58:23
**seven** 55:22
**seventh** 2:7
**several** 71:12 117:4
**sewer** 91:10
**sf000164** 54:12
**sheet** 134:7,9 135:1
**shop** 39:11 42:13,15,19
**shot** 38:23
**show** 32:19 47:10 89:25 125:4
**shower** 36:20 43:17,22 44:4
**showing** 53:7 101:12 131:5
**shown** 133:9
**shows** 68:21
**shut** 36:18
**side** 64:23 89:12
**sight** 38:24
**sign** 57:25 81:9 81:12 110:19 116:17 119:4,18 134:8
**signature** 82:1 112:2,8,20 116:4 117:19,21 118:7 119:2 133:21
**signatures** 79:16 81:7 82:20
**signed** 57:11,15 57:25 79:19 80:2,4,7 81:24 82:7,17,23,25 83:3,3,8,10 112:7,11,18,19 112:22 116:6,16 117:5 118:6 119:5,17 134:14
**signing** 83:2 112:13 116:12 116:24 118:2 119:14
**similar** 61:1 108:10
**similarly** 1:6
**simple** 75:17
**simply** 83:6
**single** 21:7
**sink** 32:11 89:17
**sir** 4:20 5:8,9 6:21,24 8:18 10:1,5,11,17 11:14,17,20 13:5 15:2 16:7,8 22:3 27:18 29:24 44:23 48:7 54:14 55:18 56:10 62:12 67:5 68:25 71:23 72:15 77:2 79:4 79:17 81:5,11 84:17 86:21 87:17 98:25 100:4 102:24 109:4 110:11 111:5,20,24 116:2 117:14 118:25 119:15 119:20,23 120:1 123:21 124:2,5 125:10 126:3 131:12
**sit** 26:3
**sits** 97:8
**sitting** 78:20 80:15 109:21
**situated** 1:6
**situation** 90:13 108:10
**sketch** 54:21
**slab** 25:22
**small** 35:2
**smith** 108:17
**snake** 31:7 41:14,15,18
**snaked** 31:5,20 32:4 33:8 41:21 41:21 43:20
**snaking** 41:16 41:17 44:10
**soaked** 42:18
**social** 13:16
**soffer** 133:6,21
**solicitor** 133:12
**solutions** 134:17
**somebody** 43:9
**somewhat** 99:17 129:14

**son** 11:6 24:12 24:23 35:14,17 36:2 39:21 55:23,24 132:7 132:14
**son's** 20:20
**sooner** 33:15 45:18
**sorry** 5:7 10:13 14:12,14,18 26:21 30:21 32:19 39:1 53:2 59:5,22 61:5 89:15 90:1 92:6 96:14 126:20
**sought** 109:5 126:13,18 127:5 127:8 128:21
**sound** 42:5 68:19 95:17 98:25 112:10 119:7
**sounds** 57:23
**sources** 55:10
**southeast** 2:3,7
**southern** 1:1
**southwest** 11:8
**space** 25:24 26:4 28:14
**speak** 27:6 48:10 50:8 54:4 55:3 68:3 77:21 93:13 106:5
**speaking** 22:1 79:22
**special** 98:22
**specific** 49:7,10 52:25 53:3,9 61:12 66:23 67:1 68:9 76:3
**specifically** 67:10 123:10
**specified** 133:12
**spoke** 15:5 45:25 103:13 105:14 106:9,11 115:3
**spoken** 14:4 21:14
**spot** 87:11
**spots** 92:1
**spouse** 100:6
**sprayed** 29:15
**spreadsheet** 109:12
**square** 21:11,13
**stage** 57:14
**stages** 57:9
**stamp** 79:16
**stamped** 84:14 98:10
**standard** 9:2
**start** 27:14 94:4
**started** 38:17,22 40:22 94:8
**starting** 55:13 84:14
**starts** 54:11
**state** 1:9 2:22 4:4,7,11,25 5:3 8:25 12:3 16:10 16:24 17:3,23 18:22,25 19:1,6 20:2 26:9,15,17 45:8,15,25 46:9 46:15,15,20 48:3 61:2 67:19 67:20 68:12,14 69:1,20,22 70:6 72:1,7,17 73:11 73:12 75:3,7,10 81:19,22 82:3,8 83:12 86:4 100:25 107:23 107:24 108:9 120:14 124:23 130:14,20 131:13 133:3,6 133:15 134:4 135:2
**stated** 131:13 135:19
**states** 1:1
**stating** 109:14
**status** 16:11 115:17 121:6
**statute** 126:4,8 126:10 134:12
**stay** 24:19
**stayed** 24:24
**stenographer** 14:12,16 96:14
**step** 38:16
**stephen** 63:3 113:15
**stepped** 52:17
**steve** 113:10
**sticks** 34:25
**stipulate** 9:15
**stop** 74:1
**stopped** 40:24 41:2 42:9 56:1
**storage** 102:9
**store** 97:7 102:14
**story** 21:9
**straight** 38:23 38:23
**straying** 106:13
**street** 2:3,7
**strike** 27:19 56:18 59:23 69:23 70:18 78:17 85:14,14 104:12 120:12 123:13,22 128:24
**struck** 36:17
**structure** 19:6
**stuff** 25:18 96:11,12
**subject** 9:7
**submitted** 67:19

**subsequent** 18:3 32:6 50:19 76:12
**subsequently** 109:19
**substance** 115:8 115:18
**sued** 69:19
**suggest** 45:3 46:16
**suggested** 134:11
**suing** 68:25 107:25
**suit** 5:14 70:18 133:13
**summer** 24:20 24:21 28:24 94:10,10
**super** 17:21
**supervision** 133:10
**supplements** 11:15
**sure** 4:23 7:25 8:14 12:14 14:19 18:25 28:18 31:19 42:20 43:4,6,11 43:24,24 44:7 46:23 57:17 58:13 59:7 62:5 65:12 71:11,24 75:19 80:19 84:18 85:8 95:8 96:24 98:21 99:21 102:2 109:7,25 114:15 116:13 120:10 123:17 127:24 127:25,25 128:1 128:19 129:3
**susan** 115:4
**swear** 4:9
**switch** 19:4 102:12
**switched** 38:5
**sworn** 4:16 133:8
**sympathize** 101:20
**system** 41:22 62:19
**systems** 91:10

**t**

**t** 1:19,20 94:2
**table** 34:18
**take** 5:1 8:12 34:16 37:4,7,12 39:8,12 44:13 49:20,23 50:4 51:1 52:19 53:18 79:3 84:20 85:4 98:6 111:24 115:25 118:23 131:14
**taken** 1:23 44:19 87:14 133:12 135:3
**talk** 29:24
**talked** 15:12 41:17 46:23 100:20 101:7 106:1 131:17
**talking** 33:19 35:3 41:16 57:19 82:19 97:13 101:21 103:4 114:12
**tank** 88:21 89:24 90:1
**tanks** 90:7
**tapped** 92:22
**taylor** 124:23
**tbarbato** 101:15
**td** 23:22
**team** 3:10
**tell** 5:15 10:23 17:21 30:7 38:15,22 39:13 47:12 79:19 82:8 93:6 121:18
**telling** 103:4 106:3
**ten** 9:8 23:17
**term** 36:23 55:3 99:25
**terms** 22:6,14 85:24 100:20,25 111:6
**terrace** 11:8
**test** 10:24
**testified** 4:17 5:22 131:23 132:6 133:8
**testify** 11:16,19 133:8
**testimony** 44:24 87:20 133:9,10 134:6,11
**text** 62:1
**thank** 4:22 61:17 87:18 110:10
**thing** 6:4 8:12 9:3 22:11 35:3 36:6 48:24 50:12 68:7 70:7 70:20 88:12 102:9 104:9
**things** 8:24 21:18 26:1 29:17 96:22 100:18 112:4
**think** 8:5 17:9 18:9,15 29:4,6 30:6 33:12 35:2 35:14,20 37:10 37:12,14,16,16 41:1 47:23 49:22,24,25 50:21 57:3 66:2 67:21,24 69:9

80:10 84:24,25 84:25 85:7 87:7 91:12,23 95:2,3 97:20,21,22 98:12 101:2 102:19 106:24 107:21 113:15 115:4 117:7 121:20,22,24 126:14 129:3,6 130:24 131:2
**thinking** 18:16 35:16 117:17
**third** 3:22 15:25 69:13 92:8 128:3,6 129:8 129:17,20,23 130:4,15,20
**thomas** 1:4,22 2:15 4:3,13,15 5:5 133:7 134:4 134:6
**thought** 12:22 70:15 73:18 103:11 120:9
**thousand** 69:10
**three** 15:9,15 18:20 22:9 23:10 28:15,19 28:20 30:7 76:22 77:6,11 81:12 88:3 92:5 92:11,25 94:7 94:12 117:25 120:6 122:18
**threshold** 39:2
**throwing** 38:17
**thrown** 58:15
**thursday** 1:14 35:18
**tile** 93:11,12,20 96:2 97:17,20 100:17
**tiled** 96:3
**time** 4:6,7 12:23 15:15,18 20:12 20:18 23:5 25:9 31:1,3,12 33:16 36:4,15 40:16 40:19,22 42:1 43:5,11,11,14 44:3,13,18,21 46:21 47:21,22 48:12 52:6,16 58:12 61:7,10 63:24 64:7 65:7 65:13,25 66:16 67:4 71:24 73:15 74:10 76:13 78:10,11 80:23 82:7,10 82:13 84:19,20 87:13,16 94:5 94:12 99:13 104:2 110:3,13 114:2 119:16 122:5 126:19,25 127:3 132:18 133:12
**timeline** 35:17
**times** 5:10 15:17 23:2 38:6 41:18 46:24 52:12 60:5 65:16 95:7 101:7 102:15 114:9
**tired** 42:8
**title** 20:22 24:1
**titled** 20:19
**tlbarbato** 13:9
**today** 5:1 11:16 15:4 16:14 17:19 20:23 78:20 109:21
**today's** 4:5
**toilet** 41:11,16 41:18,20,25 55:25 56:6 92:7 97:8,8
**toilets** 95:1 100:17
**told** 46:10 49:8 53:1 55:20 56:14 69:5 89:15
**tom** 10:3 39:19 75:18 93:5 135:2
**tombarbato** 13:11
**took** 76:10 94:6
**tool** 28:13
**top** 19:23 27:3 61:20 96:3 124:8
**total** 33:22 97:4
**touch** 62:25
**touched** 23:18
**towards** 30:12
**towels** 38:17 39:10,11 40:23 42:19
**town** 91:10
**track** 56:10
**tramont** 118:17 120:12 121:13
**transcript** 134:5 134:13
**transcripts** 134:9
**trees** 71:1 124:4
**trial** 3:18,19,21 3:22 125:3
**tricky** 130:2
**trucks** 32:2
**true** 21:14 133:10 135:19
**truth** 133:8
**try** 8:7,15 42:12 64:10
**trying** 40:23 61:15 69:23 97:1
**tub** 37:9 40:4,18 41:6 42:10,13

Case 1:22-cv-22891-EA Document 105-6 Entered on FLSD Docket 02/13/2026 Page 64 of 68




42:21 43:16,16 43:17,22 44:4 52:23
**tubs** 41:18
**turn** 41:4 55:1 98:20
**twice** 65:5,6,8 65:11
**twitter** 13:21,22
**two** 11:3,4 14:10,17 15:6 18:9 24:7,14,18 28:15,18,19,19 28:20 30:4,4,7 30:16,17,20,21 40:13 49:4 51:1 51:3,3,4 52:17 56:7 64:15,25 72:10,23 79:16 82:20 90:3,7 91:25 92:25
**type** 36:6 48:24 50:12
**typed** 117:22 119:13
**typewriting** 133:9
**typical** 31:4 41:13,23
**typically** 57:11

**u**

**u** 5:7
**uh** 35:9 55:17 63:8 64:13
**ultimately** 74:2 78:17,18 85:1
**umpire** 3:3 70:8 70:9 76:15,16 77:16,21 78:4,7 78:24 79:14 81:24 82:1,22 85:23
**under** 5:24 6:5 13:24 21:12 89:3 91:13 92:7 97:15 133:9 134:12 135:18
**understand** 7:13,21,24 16:23 19:11,12 56:12 75:5 105:25 112:24 116:18,21 118:10,12 119:19,22 127:6 130:2
**understanding** 70:3 81:5 111:9
**understood** 7:19 8:17 49:1
**undisputed** 109:14
**unemployed** 11:24
**united** 1:1
**unscathed** 96:20
**update** 87:20
**usa** 3:10
**use** 33:15 37:11 37:15 44:3 102:10
**used** 13:13 37:15 43:14,15 43:15,17,24 56:7 94:15 95:7 134:14
**using** 41:19,20 43:22 56:1
**usually** 7:5 90:10 94:11

**v**

**v** 1:19 10:20 55:8
**vac** 39:11 42:13 42:15,19
**vaguely** 97:25
**value** 21:15
**valve** 55:25 56:6
**valves** 41:4
**vanities** 95:1 100:17
**vanity** 97:9
**various** 102:7
**venmo** 59:3
**verbal** 7:8,11
**verify** 134:6
**veritext** 134:9 134:17
**veritext.com** 134:9
**versa** 67:1
**versus** 4:4 128:21
**vice** 67:1
**vicinity** 43:3
**video** 4:2,2 44:21 65:25 68:1 69:5 89:25 126:25 127:2 132:18
**videographer** 2:10 4:1 7:2 33:2 44:17,20 87:12,15 110:2 110:5 126:24 127:2 132:17
**videos** 37:4,7 53:18 67:12
**virtual** 25:12 48:1
**voluntary** 3:9 86:10
**vs** 1:8 124:23 134:4 135:2

**w**

**w** 3:7 27:4
**waddell** 27:1,4 27:6

**wait** 8:4 26:22 42:13
**walk** 61:1
**walked** 40:20
**wall** 32:14 90:22,23 111:2
**walls** 96:3
**want** 4:23 7:23 18:18 21:15,18 21:20 24:20 28:23 29:24 32:21 48:23 64:21 81:18 86:12 103:3 107:1,21
**wanted** 27:13 44:7 54:25 67:25 69:19 103:21 120:10
**warning** 73:24
**warrant** 9:1 131:15
**washing** 36:14
**watched** 93:10
**water** 19:22 30:3,15,24 35:24 36:22,24 36:24 37:8,9 38:15,16 39:6 40:3,6,13,17,20 42:9,12,20 56:8 98:17 101:12
**way** 6:25 8:22 8:25 13:21 24:3 38:7 52:19 54:22 60:10 68:8,9 71:11 81:21 90:20 103:8,16,17
**we've** 41:21 97:2 101:2,7 121:19
**week** 15:13 45:13 56:5
**weeks** 51:1,4 64:25
**welcome** 87:17 110:9
**went** 16:15 30:4 30:19,20,22 34:5 40:7,16 42:16 44:3 48:14,14,15,15 49:5 58:24 68:8 73:1 77:13 88:22 89:8 94:24 95:1,3
**wet** 29:11
**whatnot** 53:8
**wife** 14:3 15:8 20:19 23:24 24:6 25:8 35:14 36:1 38:9,9,11 39:17 46:5 47:20 55:23 74:20 83:18 96:24 97:6 105:24,25 112:20 116:17 118:6 119:17 125:25 132:7,14
**wife's** 72:18 84:5
**wilma** 18:17
**wind** 19:2 20:5
**windstorm** 17:4 17:5 18:25 20:5 26:18
**winter** 123:20
**wise** 9:22
**withdraw** 85:14
**witness** 2:14 4:9 4:16 5:17 14:15 32:25 96:15 133:9,10,14 135:2,21
**words** 30:1
**work** 12:8,15,17 13:12 14:22 19:17 42:7 70:6 93:4,8,11,12,15 93:19 94:16,16 95:5 98:11 99:8 99:10
**worked** 5:13
**works** 7:1 25:8 25:9 47:24 95:22
**worried** 18:13
**worry** 6:16 70:19
**worth** 54:23
**written** 107:8 110:19 115:9 122:21 123:9
**wrong** 47:13
**wrote** 12:12 28:18 119:10

**x**

**x** 2:13 17:20

**y**

**y** 10:20
**year** 29:2 33:22 33:22 93:3 94:7 94:8 96:23
**years** 5:20 11:11 12:2,4 14:10,10 14:15,17,20 23:8,17,18 33:20 55:22 92:25 93:16
**yvonne** 1:5 2:10 4:13 10:20

**z**

**z** 96:15
**zelle** 59:3,6 60:10,20 97:21
**zone** 17:20
**zoom** 15:18 114:22 122:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.